JAMES P. BOWLER, PLAINTIFF-APPELLANT, v. FIDELITY & CASUALTY COMPANY OF NEW YORK, DEFENDANT-RESPONDENT.

Argued December 17, 1968—Decided March 3, 1969.

314

316

*Mr. Robert C. Gruhin* argued the cause for appellant.

*Mr. Stanley G. Bedford* argued the cause for respondent (*Messrs. Mead, Gleeson, Hansen & Pantages,* attorneys).

The opinion of the court was delivered by

FRANCIS, J. Plaintiff James B. Bowler as the holder of a "Maximum Benefit Accident" insurance policy issued to him by defendant Fidelity & Casualty Company of New York sought certain benefits allegedly due thereunder. On defendant's motion the trial judge ordered summary judgment in its favor on plaintiff's claim for total and permanent disability benefits. He also entered summary judgment for

plaintiff requiring defendant to pay one week's benefits in addition to those previously paid for total disability as defined in the policy. Both parties appealed from the adverse portions of the judgment. The Appellate Division denied any recovery, holding that plaintiff was barred by the six-year statute of limitations on the institution of suit. *Bowler v. Fidelity & Casualty Co. of New York*, 99 *N. J. Super.* 184 (*App. Div.* 1968) ; *N. J. S.* 2A :14–1. We granted plaintiff's petition for certification. 51 *N. J.* 578 (1968).

On January 24, 1949, Fidelity & Casualty issued a policy of accident insurance to Bowler. It provided among other things :

"Article 2. If the Insured suffers total disability that within thirty days from the date of the accident continuously prevents the Insured from performing each and every duty pertaining to his occupation, the Company will pay for the period of the said disability, not exceeding two hundred consecutive weeks, [$50] The Weekly Indemnity."

It provided further :

"Article 3. If the Insured suffers total disability that within thirty days from the date of the accident continuously prevents the Insured from performing each and every duty pertaining to his occupation for the period of two hundred consecutive weeks, and if at the end of the said period the Insured is totally and permanently disabled, as the result of the bodily injury causing the said two hundred weeks' disability, and is thereby permanently incapable of engaging in any occupation or employment for wage or profit, the Company, in addition to the Weekly Indemnity paid under Article 2, will pay an amount equal to the [$50] Weekly Indemnity For 600 Weeks."

In an accidental fall on January 31, 1954, Bowler suffered a severe fracture of both lower bones of his right leg. He was unemployed at the time, having lost his employment with Sears 'Roebuck & Company as a buyer of ladies coats about three weeks earlier. He was hospitalized the next day and underwent an open operation for reduction of the fractures. After 70 days he was allowed

to go home, but it was necessary to return in a short time for a second operation. In October, after a further confinement of 30 days, he went home but was to continue under medical care. Subsequently osteomyelitis developed at the site of the fractures. The condition is a serious bone infection which sometimes develops after fractures. At times, as obviously was the situation in the present case according to the medical reports, the infection becomes chronic and results in the rotting away of the bone, usually accompanied by pus drainage through an ulcer in the outer surface of the leg in the area of the fracture. (For a general description of osteomyelitis, its causes and effects, see 1 *Gray's Attorneys' Textbook of Medicine* ¶ 2.47(8), (12) (*3d ed. Supp.* 1968) ; and see, *Nickolopulos v. Equitable Life Assurance Society,* 113 *N. J. L.* 450, 452 (*E. & A.* 1934)

It is undisputed that Proof of Claim for total disability was filed under Article 2 of the policy. Total incapacity was recognized by the company and weekly disability benefits were paid thereunder for 199 weeks or through November 25, 1957. Since the policy required continuous disability as a condition to continued payments, the company frequently sent appropriate forms to Bowler for completion. They were executed by him and his treating physician. Moreover, the insurer had him examined periodically by a physician of its own choice, and being satisfied that the condition of his leg constituted total disability, continued the weekly payments for the period mentioned.

As the end of the 200-week period contemplated by Article 2 approached, Fidelity & Casualty wrote Bowler on November 18, 1957 asking him to report to its Newark, N. J. office. Apparently on that date he was given additional claim forms to be completed by himself and his treating physician. These forms were completed and were stamped received by the New York office of the company on November 26, 1957. In the form signed by Bowler he asserted continuous and total disability "to date." The attending physician's state-

ment was executed by Dr. Leo Fisher on November 25, 1957. He had been treating Bowler from the day after the accident. The statement referred the company to his previous reports; it said the patient was still under treatment and that the doctor could not state how long Bowler would be continuously totally disabled. On the same date as Dr. Fisher's report the Newark office of the company issued its weekly benefit check for the 199th week of Bowler's continuous disability. The record is not clear as to whether the check dated November 25 went out before or after the doctor's report was received. The probability is that it was sent before the report because the check bears the notation "Case not closed."

It is obvious that when the company sent the check covering the 199th week, it was aware of the significance of the upcoming 200th week payment. The claim had been under close observation. For example, it appears that forms such as those just mentioned had been completed at the company's request about every five weeks (99 *N. J. Super.*, at 191). On the basis of those reports continuous total disability had been recognized and the payments required by the policy made for two years, ten months and three weeks— 199 weeks. The company knew that if Bowler was totally and permanently disabled within the meaning of Article 3 of the contract when the 200th payment was due and paid, it was obliged under that article to pay an additional amount "equal to the [$50] Weekly Indemnity For 600 Weeks." The company's position is that if at the end of the 200-week period the disability is total and permanent, this 600 weeks' obligation is payable in one lump sum (not in 600 weekly installments). Thus if such disability existed on December 2, 1957, the 200th week, a duty existed to make the last remaining weekly payment of $50, and in addition to make one further payment of $30,000.

The insured urged that the intention of Article 3 as revealed by all of the policy language was to provide weekly

benefits of $50 for 600 additional weeks, rather than a single amount of $30,000. The Appellate Division accepted the insurer's view. It was impressed by the fact that under Article 2 the total disability must be continuous for the 200 weeks to qualify a policyholder for benefits for that period. This requirement contrasted with the Article 3 language which provided for payment of an amount equal to 600 weeks if at the "end" of the 200 weeks the insured is totally and permanently disabled. And the Appellate Division said, "There is no proviso whereby the payment is limited to the weeks during which plaintiff will be disabled thereafter, or whereby the company may terminate payments in the event that total and permanent disability, as therein defined, ceases." 99 *N. J. Super.*, at 195. In view of the disposition we have decided upon for purposes of this case we will accept the insurer's position that benefits due under Article 3 are to be paid in one lump sum.

In light of the company's concession as to the extent of its Article 3 obligation, it is understandable that sometime in the latter part of November Bowler was asked by the company to submit to re-examination by its own physician, Dr. J. G. Siegel. The examination took place on November 26, 1957 at the doctor's office. Dr. Siegel's last previous examination was on April 29, 1957. In his report the doctor noted that Bowler remained under the care of Dr. Fisher, the last visit having been on November 12 at which time the injured leg was dressed and x-rays taken. The next visit was scheduled for January 1958.

In order to achieve the proper perspective for consideration of Dr. Siegel's findings and report, we turn first to the meaning and application of the policy requirement that the insured be "totally and permanently disabled * * * and * * * is thereby permanently incapable of engaging in any occupation or employment for wage or profit." It is fundamental, of course, that courts will interpret insurance policy language liberally in favor of the insured. *Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur*, 35 *N. J.* 1, 7 (1961);

*Kievit v. Loyal Protect. Life Ins. Co.*, 34 *N. J.* 475, 482 (1961); and see *Fannick v. Metropolitan Life Ins. Co.*, 34 *N. J. Super.* 556 (*App. Div.* 1955).

To be totally disabled within the language of such policies a person does not have to be bedridden, or absolutely disabled or paralyzed or completely unable to get about, or unable to carry on any activity whatever. *Nickolopulos v. Equitable Life Assurance Society, supra; Gross v. Com. Cas. Ins. Co.*, 90 *N. J. L.* 594 (*E. & A.* 1917); *Fannick v. Metropolitan Life Ins. Co., supra; Peterson v. Hartford Accident & Indemnity Co.*, 32 *N. J. Super.* 23 (*App. Div.* 1954); and see *Kalson v. Star Elec. Motor Co.*, 15 *N. J. Super.* 565 (*Cty. Ct.* 1951), affirmed 21 *N. J. Super.* 15 (*App. Div.* 1952). The disability is total if the insured is unable to engage in a remunerative occupation, or to do work in some profitable employment or enterprise. *Feldmann v. Metropolitan Life Ins. Co.*, 14 *N. Y. S. 2d* 652 (*App. Div.* 1939). The fact that he can do trifling work or a trifling amount of work or work of an unimportant character or light work at irregular intervals does not disqualify him. *John Hancock Mut. Life Ins. Co. v. Schroder*, 235 *Ala.* 655, 180 *So.* 327 (1938); *Rickey v. New York Life Ins. Co.*, 229 *Mo. App.* 1226, 71 *S. W. 2d* 88 (1934); *Gross v. Com. Cas. Ins. Co., supra; Leonard v. Pacific Mut. Life Ins. Co.*, 212 *N. C.* 151, 193 *S. E.* 166 (1937). If because of the physical condition, gainful employment cannot be obtained or performed, total disability is established. Work which disqualifies must be profitable or advantageous to the insured, rather than some trivial work which yields only an inconsequential emolument. The remuneration must be something reasonably substantial rather than a mere nominal gain or profit. *Mutual Life Ins. Co. v. Bryant*, 296 *Ky.* 815, 177 *S. W. 2d* 588, 153 *A. L. R.* 422 (*Ct. App.* 1943); *Zakon v. Metropolitan Life Ins. Co.*, 328 *Mass.* 486, 104 *N. E. 2d* 603 (1952); *Aetna Life Ins. Co. v. Motheral*, 183 *S. W. 2d* 677 (*Tex. Civ. App.* 1944). It has been said that to bar recovery the earnings must approach the dignity of a liveli-

hood. *Erreca v. Western States Life Ins. Co.*, 19 *Cal. 2d* 388, 121 *P. 2d* 689, 695, 141 *A. L. R.* 68 (1942); and see *Hughes v. Mutual Life Ins. Co.*, 180 *F. 2d* 542 (*9th Cir.* 1950). If ability is limited to some temporary work, no bar to policy benefits exists; to be barred the insured must be able to do gainful work with reasonable and substantial continuity and regularity. *United States v. Fitzpatrick*, 62 *F. 2d* 562 (*10th Cir.* 1933); 1*A Appleman, Insurance Law and Practice* § 682, *p.* 641 (1965); 15 *Couch on Insurance 2d* § 53:58, *p.* 67 (1966). Futile attempts to return to a job would not prevent recovery. *Joyce v. United Insurance Co. of America*, 202 *Cal. App. 2d* 654, 21 *Cal. Rptr.* 361, 17 *A. L. R. 3d* 517 (1962). In fact, some courts have declared that in order to recover for total disability an insured must show that he made an effort to adapt himself to work other than his regular work and that his condition would not permit, or that he tried to do other work and to secure other employment. See *Prudential Ins. Co. of America v. Brookman*, 167 *Md.* 616, 175 *A.* 838 (*Ct. App.* 1934); *White v. Aetna Life Ins. Co.*, 117 *W. Va.* 214, 185 *S. E.* 236 (1936). If he is so incapacitated that substantially all activities of any regular employment are closed to him, he is entitled to the policy benefits. To give the policy language the meaning that a bar to recovery exists if the insured can engage in any work at all for any gain no matter how small or how transient or irregular, clearly would be to impose an undue limitation upon the construction of the contract and the reasonable expectations of the parties. Under such an interpretation if the policyholder could sell peanuts, or shoestrings or pencils or engage in some similar calling, there would be no disability under the policy. See *Peterson v. Hartford Accident & Indemnity Co., supra*, 32 *N. J. Super.*, at 29; *Nickolopulos v. Equitable Life Assurance Society, supra*, 113 *N. J. L.*, at 456–457. Moreover, it should not be overlooked that necessity sometimes drives people to do things they are not able to do. *Fannick v. Metropolitan Life Ins. Co., supra*, 34 *N. J. Super.*, at 564–565.

An insured's total disability is deemed permanent when it is shown to be in a state of indefinite continuance, *i. e.*, that recovery, even if such a possibility exists, is so far removed that the end of the disability cannot be foreseen. Permanency does not have the extreme significance of absolute perpetuity, everlasting, lifelong or unending. As used in a policy it means that the disability has the quality of indefinite projection into future time, as distinguished from being merely transient or temporary. See *New England Mut. Life Ins. Co. v. Hurst*, 174 *Md.* 596, 199 *A.* 822 (*Ct. App.* 1938); 1*A Appleman, supra* § 641, *p.* 529. And the very fact that the incapacity has continued over a long period of time is cogent evidence of permanency. See *Mc-Govern v. United States*, 294 *F.* 108 (*D. Mont.* 1923), affirmed 299 *F.* 302 (*9th Cir.* 1924), *error dismissed* 267 *U. S.* 608, 45 *S. Ct.* 351, 69 *L. Ed.* 812 (1925); *Mirabella v. Metropolitan Life Ins. Co.*, 143 *Pa. Super.* 500, 18 *A.* 2*d* 474 (1941); 15 *Couch on Insurance* 2*d* § 53:105, (1966).

We return now to a study of Dr. Siegel's report in order to consider whether the authorities cited justify the view that Bowler was totally and permanently disabled under defendant's policy on November 26, 1957 when the examination took place. The report is dated December 2, 1957 and stamped as received by the company on December 9, a week *after* the 200th disability payment was due. It is important to note here that the critical date for decision as to whether Bowler is totally and permanently disabled is the end of the 200th week. If he was so disabled at that time the obligation of defendant arose to pay the 600 weeks' benefits in a lump sum.

According to Dr. Siegel, on November 26, 1957 Bowler still had an ulcer on his right foreleg. He walked with the aid of a cane and had a limp. Further,

"He is still walking with a long leg brace over the right leg. There is marked swelling of the entire lower extremities with ankylosis of the ankle. He still has marked induration of the lower third of the

foreleg with a draining sinus through which can be seen a slough. Drainage is foul smelling."

He reported that the "man has still made very little improvement." (This is almost three years after the accident.) He "has a very, very poor leg and foot." The report continued,

"At the present time there is no doubt that this man is capable of doing many types of work and that he is not totally and completely disabled. However, I do not think that he would have any success in obtaining a job because if anyone saw him walking with the aid of a cane and limping, they would probably inquire as to the cause of the limp and if they took one look at this leg then they certainly would refuse to hire him."

In summarizing the situation the doctor reiterated that Bowler had a very bad leg "which will ultimately require amputation."

Prior to receiving Dr. Siegel's report, the company had already received one on November 26, 1957 from the treating physician, Dr. Fisher, showing continuous and total disability on November 25, and making it plain that the condition would continue and require treatment into the indefinite future. At least by December 9, therefore, in view of the nature of the disability, the years of continuous medical treatment and the obvious need for further treatment indefinitely, it is clear beyond all doubt that Bowler was entitled to payment of the benefit for the 200th week. Likewise there can be no reasonable doubt that the company knew it was obliged to make the payment. But it did not do so and has failed to do so to this day. On oral argument of this appeal, we inquired as to the reason for this failure and were informed that the company feared the 200th payment would amount to an admission that it also owed the 600 weeks' payment for total and permanent disability under Article 3. In this action the trial court found as a matter of law that Bowler was totally disabled for that final week

and the Appellate Division in its opinion noted that the finding was not disputed on appeal. Instead of fulfilling its contractual obligations, the company lapsed into silence, and not only failed to pay the 200th week but ignored the practically conclusive proof of Bowler's then existing total and permanent disability under Article 3 of the policy. After receiving Dr. Siegel's examination report, payment of benefits was cut off without a word, and the insurer never again initiated any communication with its policyholder with regard to the matter. Bowler, a layman obviously not versed in insurance law took no legal action until in some manner, not explained in the present record, he got into the hands of an attorney, and this suit was brought—more than six years after the end of the 200 week total disability period. When this was done, the insurer pleaded the six-year statute of limitations, *N. J. S.* 2A :14–1 as a bar. We regard such treatment of its policyholder as shocking and unconscionable.

Corporations franchised to sell life and accident and health insurance policies to the public enjoy many privileges, advantages and protections not commonly available. Their favored position requires the assumption of a stern obligation toward people who purchase their contracts. Simply described the obligation is that of fair dealing. Insurance policies are unipartite in nature. They are prepared by the company's experts, men learned in the law of insurance who serve its interests in exercising their art of draftsmanship. The resulting document with its many clauses is given to the insured in printed form upon the payment of the premium. There is no arm's length bargaining such as characterizes negotiations between equals in the marketplace. Consequently courts in their quest for justice for the insured, universally give him the benefit of any construction of the language which can be said fairly to represent the protection extended to him. *Linden Motor Freight Co., Inc. v. Travelers Ins. Co.*, 40 *N. J.* 511, 524–525 (1963) ; *Mazzilli v. Acc. & Cas. Ins.*

*Co. of Winterthur, supra; Kievit v. Loyal Protect. Life Ins. Co.,* 34 *N. J.* 475, 482 (1961).

Insurance policies are contracts of the utmost good faith and must be administered and performed as such by the insurer. Good faith "demands that the insurer deal with laymen as laymen and not as experts in the subtleties of law and underwriting." *Merchants Ind. Corp. v. Eggleston,* 37 *N. J.* 114, 122 (1962) ; *Gallagher v. New England Mutual Life Ins. Co. of Boston,* 19 *N. J.* 14, 20 (1955). In all insurance contracts, particularly where the language expressing the extent of the coverage may be deceptive to the ordinary layman, there is an implied covenant of good faith and fair dealing that the insurer will not do anything to injure the right of its policyholder to receive the benefits of his contract. This covenant goes deeper than the mere surface of the writing. When a loss occurs which because of its expertise the insurer knows or should know is within the coverage, and the dealings between the parties reasonably put the company on notice that the insured relies upon its integrity, fairness and honesty of purpose, and expects his right to payment to be considered, the obligation to deal with him takes on the highest burden of good faith. *Cf. Bowers v. Camden Fire Ins. Assoc.,* 51 *N. J.* 62, 72, 79 (1968) ; *Crisci v. Security Ins. Co.,* 66 *A. C.* 435, 58 *Cal. Rptr.* 13, 426 *P. 2d* 173 *(Sup. Ct.* 1967) ; *Comunale v. Traders & General Ins. Co.,* 50 *Cal. 2d* 654, 328 *P. 2d* 198, 200–201, 68 *A. L. R. 2d* 883 (1958) ; *Brassil v. Maryland Casualty Co.,* 210 *N. Y.* 235, 104 *N. E.* 622, *L. R. A.* 1915 *A,* 629 *(Ct. App.* 1914) ; *Hilker v. Western Automobile Ins. Co.,* 204 *Wis.* 1, 231 *N. W.* 257 (1930), affirmed 235 *N. W.* 413 (1931). In situations where a layman might give the controlling language of the policy a more restrictive interpretation than the insurer knows the courts have given it and as a result the uninformed insured might be inclined to be quiescent about the disregard or non-payment of his claim and not to press it in timely fashion, the company cannot ignore its obligation. It cannot hide behind the insured's

ignorance of the law ; it cannot conceal its liability. In these circumstances it has the duty to speak and disclose, and to act in accordance with its contractual undertaking. The slightest evidence of deception or overreaching will bar reliance upon time limitations for prosecution of the claim.

More specifically, in a situation such as that present here, if all or part of the benefits provided by the policy clearly is due, the insurer must make the payment. If it fails to do so, and the statute of limitations or a policy limitation intervenes before suit is started, it will be estopped to plead the limitation in avoidance of a trial on the merits of the claim. Further, if the insurer has factual information in its possession substantially supporting the policyholder's right to benefits, but it has a reasonable doubt as to whether the evidence is sufficient to require payment, the obligation to exercise good faith, upon which it knows or should know the insured is relying, cannot be satisfied by silence or inaction. It must notify the insured of its decision not to pay his claim. But mere naked rejection would not be sufficient. The giving of such notice should be accompanied by a full and fair statement of the reasons for its decision not to pay the benefits, and by a clear statement that if the insured wishes to enforce his claim it will be necessary for him to obtain the services of an attorney and institute a court action within the appropriate time. The "appropriate time" means the time remaining under the policy or the applicable statute of limitations within which the suit must be brought. Failure on the insurer's part to follow such a course, will bar reliance on the statute of limitations or a time restriction on court action expressed in the policy.

This case presents an apt illustration of the principle. Under the policy the company agreed to pay Bowler a sum equal to 600 weeks' benefits if at the end of 200 weekly payments for total disability, he was "totally and permanently disabled * * * and is thereby permanently incapable of engaging in any occupation or employment for wage or profit." In the face of this strong language, a layman, un-

aware of its legal significance as outlined above, possessed of two good arms, one good leg and a normal mind, and who conscientiously wished to try to do some work, might accept the company's cessation of payments as implying in good faith its conclusion that his disability did not qualify him for the additional 600 weeks' benefits. But the company, conscious of the state of the law and the state of the claim file in its possession, knew or should have known better. It had current proofs of claim from its insured and his treating physician, as well as a substantially decisive report from its own examining doctor.[1]

These proofs, the most significant of which came from its own physician, made out a clear case of duty to pay the 200th-week benefit. Failure to make this payment constitutes conduct incompatible with the insurer's obligation to exercise good faith in dealing with its insured, and *of itself* creates an equitable estoppel against the plea of the statute of limitations. Moreover, the facts establish another independently adequate ground for such an estoppel. The information in the company's possession certainly revealed a substantial case of total and permanent disability within the meaning of the policy. Since Bowler had no knowledge of that information, the company's deceptive action in failing to disclose the state of its own knowledge about his disability and its effect on his employability, or to request further evidence of his apparent total and permanent disability,

---

[1] There is some suggestion that additional formal proofs of loss should have been filed at the end of the 200-week period in support of the allegedly independent claim under Article 3. In view of the state of the company's knowledge and its request for completion of proofs of claim just before the 199th week payment, completion of these forms plus its own doctor's up-to-date report furnished adequate notice of the existence of the company's additional obligation. If it wished anything further, its duty was to make the request. *Cf. Glauser v. Philadelphia Life Ins. Co.*, 106 *Pa. Super.* 266, 161 *A.* 437 (1932). Neither defendant's answer to this suit nor the pretrial conference order asserted a denial of liability because of failure to file additional proofs of claim. We regard any intimation of such a defense as frivolous.

was an obvious breach of its duty of good faith and fairness in the handling of its contractual undertaking. In this connection it should be noted that paragraph 10 of the "Standard Provisions" of the policy mandated that the company pay any lump sum benefit due immediately upon receipt of proper proof. Even if no such provision appeared, it would be considered included by virtue of *N. J. S. A* 17:38–13.2(*A*) which requires it. In view of all the circumstances, particularly the insurer's superior knowledge of the legal connotation of total and permanent disability, its superior knowledge of the facts as shown by Dr. Siegel's report, the information from Dr. Siegel that Bowler was not working at the time of the examination and that any prospective employer who took "one look" at his leg would "certainly refuse to hire him," we regard the company's cessation of payments and its unexplained avoidance of its contractual obligation as so inequitable and unconscionable as to bar reliance upon the statutory limitation on the institution of suit on the policy. Such conduct cannot be permitted to support a technical defense which would avoid a decision on the merits, enforce a forfeiture and bestow on the carrier a shockingly unfair advantage. See *Ellgass v. Brotherhood of Railroad Trainmen Ins. Dept.,* 342 *F. 2d* 1, 4 (*9th Cir.*), *certiorari* denied 381 *U. S.* 911, 85 *S. Ct.* 1536, 14 *L. Ed. 2d* 434 (1965) ; *Bollinger v. National Fire Ins. Co.,* 25 *Cal. 2d* 399, 154 *P. 2d* 399 (*Sup. Ct.* 1944) ; *Phillis v. City of Santa Barbara,* 229 *Cal. App. 2d* 45, 40 *Cal. Rptr.* 27 (*D. Ct. App.* 1964) ; *State by Parsons v. United States Steel Corp.,* 22 *N. J.* 341, 359 (1956) ; *Noel v. Teffeau,* 116 *N. J. Eq.* 446 (*Ch.* 1934) ; 3 *Pomeroy's Equity Jurisprudence* (*5th ed.* 1961) § 802 at 180; *Developments in the Law — Statutes of Limitations,* 63 *Harv. L. Rev.* 1177, 1222–23 (1950) ; and *cf. New York Life Ins. Co. v. Talley,* 72 *F. 2d* 715 (*8th Cir.* 1934).

In *Bollinger, supra,* Justice Traynor speaking for the court said:

"The insurance policy incorporated by reference in the complaint is of the usual complexity. While courts are diligent to protect insurance companies from fraudulent claims and to enforce all regulations necessary to their protection, it must not be forgotten that the primary function of insurance is to insure. When claims are honestly made care should be taken to prevent technical forfeitures such as would ensue from an unreasonable enforcement of a rule of procedure unrelated to the merits.

\*     \*     \*     \*     \*     \*     \*     \*

Under the circumstances it would be a perversion of the policy of the statute of limitation to deny a trial on the merits. \* \* \* [154 *P.* 2*d* at 403.]

\*     \*     \*     \*     \*     \*     \*

Principles of equity and justice, which moved this Court in the Kimball case, supra, [Kimball v. Pacific Gas & Electric Co., 220 *Cal.* 203, 30 *P.* 2*d* 39 (1934)] to grant relief are likewise controlling here. There is no need to make fine distinctions as to the persons who owe a duty to disclose. The Kimball case involved an employer whose fiduciary obligations to his employees are uncertain. The present case involves an insurer whose duty of good faith in dealing with the insured is well established. [citations omitted]. It is likewise unnecessary to dwell upon the contention that the insurer's duty of good faith to its insured arises at the time of contracting and persists throughout the period when premiums are paid and no return is sought, but that when a loss occurs and the insured seeks to obtain the compensation provided in the contract, the parties deal at arm's length. It is sufficient to hold that the equitable considerations that justify relief in this case are applicable whether defendant violated a legal duty in failing to disclose its intention to set up this technical defense, or whether it is now merely seeking the aid of a court in sustaining a plea that would enable it to obtain an unconscionable advantage and enforce a forfeiture." 154 *P.* 2*d* at 406.

Although none of the cases cited immediately above involved precisely the issue presented here, in our view all of them point in the direction of the result we consider just. It would be a reproach to the law if there were no means of avoiding the unjust result the company seeks to impose upon the insured. Consequently we hold that the Appellate Division erroneously applied the statute as a bar to his claim.

As we have already said, the question of Bowler's total and permanent disability must be tested by his condition *at the end of the* 200-*week period* specified in the policy. The evidence described above strongly supports the conclusion that he was so disabled at that time. In that con-

nection, Bowler's subsequent history as revealed by the deposition taken by defendant after the institution of this suit strengthens the view that he was so disabled at that critical time and continued to be so disabled thereafter.

On October 2, 1964, the date of the deposition, Bowler was living in Jersey City with his sister-in-law. He had been living there for about two and one-half years. Prior to that time he had lived off and on with a sister in New York City, a daughter in Bradley Beach and a son in Monmouth Beach, N. J. He was unemployed when he testified. Since about 1960 he had been receiving $105 a month under the Social Security disability program. See, Annotation, *Social Security Act — Disability*, 77 A. L. R. 2*d* 641 (1961). (He was only 47 years of age at the time of his injury.) He had had no employment since 1958 when he worked for a time under circumstances to be outlined hereafter. He filed no income tax returns since 1958. There seems to be no doubt that he tried to find some kind of work he could do sitting down but as Dr. Siegel had predicted in November 1957, once personnel people saw his leg and his cane his chance of employment ended.

The Social Security monthly payment represented his only regular source of income. At times his children would give him a few dollars. A charitable foundation, the Garment Club, Inc., with which he had some connection, presumably because of his earlier work in the garment and fabric industry, provided some benefits when dire need existed. In August 1964 he had been given a check for $250. For some unspecified time prior to the deposition, he had been going to the garment center usually on Wednesday and Thursday of each week and walking around the two block wide, one block long area trying to sell "goods." Describing the results he said, "Once in a while they throw you a bone. They do you a favor. I made $6 the other day." This was "lunch money for a couple of days."

At the time of the deposition he was walking with the aid of a cane. After four years of use the leg brace referred

to by Dr. Siegel in November 1957 had worn out. A new one cost between $150 and $165 and the appropriate shoe cost $50. Since he had no money, he had to get along without them. While testifying he exhibited his foot and leg to counsel. The shoe he was wearing could not be laced fully. The foot was swollen and discolored. The ulcerated wound on the leg was still draining. At this time he was wearing a bandage, a cotton sock over it, then an Ace Bandage and over it a woolen sock. He had received no treatment from Dr. Fisher for about two years. He took care of the foot and leg by himself, cleaning out the wound with alcohol every other day.

He testified that in 1958 he was employed as a salesman for 13 weeks in the fabrics industry. He was not able to work a full day, usually making only two stops, one at Sears Roebuck and the other a few blocks away at J. C. Penny Company. Although he was so occupied five days a week, the daily calls took about two hours. After this employer went out of business Bowler obtained a job selling canvas material which was used between the lining and the outside cloth of coats. His limited mobility permitted him to operate about four hours a day. When he failed to be sufficiently productive, he was dropped. These employments occurred over a period of about six months in 1958. After this he tried to sell material on commission for jobbers in the garment area. Such efforts produced a pittance over the succeeding years. In the six-year period since 1958 his total earnings had been less than $2,000.

On the basis of the depositions certain conclusions may be drawn. Bowler had the will to work, the efforts he made to do so resulted in failure because of his physical incapacity. His disability with its accompanying manifestations — the limp, the cane, the partially unlaced shoe, the bandaged limb — and his inability even in the eyes of a layman to pass a physical examination, had removed him from the labor market as an employable human being. Furthermore, it is clear that the limited work performed in 1958 (or even in

"approximately" 1957 as the answer to interrogatories states), of itself, would not justify a finding that he was not totally and permanently disabled as contemplated by the insurance policy. In this connection the language of the United States Supreme Court in *Berry v. United States,* 312 *U. S.* 450, 61 *S. Ct.* 637, 85 *L. Ed.* 945 (1941) is particularly pertinent. There, 13 years after receiving war injuries and after many attempts to engage in fruitful occupations, the insured sued on his war risk insurance policies to establish that he became totally and permanently disabled prior to December 1, 1919 while the policies were still in force. (No statute of limitations was involved.) The trial court sent the issue to the jury which found in his favor. In sustaining the judgment Justice Black speaking for a unanimous Court said:

"Taking the evidence as a whole, the jurors, who heard the witnesses and personally examined the petitioner's wounds, could fairly have reached the conclusion that since his injuries petitioner never had been able, and would not be able thereafter, to work with any reasonable degree of regularity at any substantially gainful employment.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

It was not necessary that petitioner be bed-ridden, wholly helpless, or that he should abandon every possible effort to work in order for the jury to find that he was totally and permanently disabled. It cannot be doubted that if petitioner had refrained from trying to do any work at all, and the same evidence of physical impairment which appears in this record had been offered, a jury could have properly found him totally and permanently disabled. And the jury could have found that his efforts to work — all of which sooner or later resulted in failure — were made not because of his ability to work but because of his unwillingness to live a life of idleness, even though totally and permanently disabled within the meaning of his policies." 312 *U. S.* at 455–456, 61 *S. Ct.* at 639. [Footnotes omitted.]

See also, *Everhart v. State Life Ins. Co.,* 154 *F. 2d* 347, 354–355 (*6th Cir.* 1946); *United States Casualty Co. v. Perryman,* 203 *Ala.* 212, 82 *So.* 462 (1919); *Hill v. New York Life Ins. Co.,* 38 *Cal. App. 2d* 627, 101 *P. 2d* 752

(*D. C. App.* 1940); *Fitzgerald v. Globe Indemnity Co.,* 84 *Cal. App.* 689, 258 *P.* 458 (*D. C. App.* 1927).

Our holding that the company is equitably estopped from relying upon the statute of limitations is not dispositive of the action. Although, as we have indicated, the present record is persuasively indicative of plaintiff's total and permanent disability at the termination of the 200-week period, plaintiff made no motion for summary judgment on that ground. Nor did defendant in its motion seek such a judgment on the specific ground that plaintiff's answers to interrogatories and his testimony on deposition established as a matter of law that total and permanent disability did not exist at the critical time. The stress was on the statute of limitations. Declaring that the Article 3 policy provision called for weekly payments for 600 weeks and not for payment in one lump sum, the trial court held the bar of the statute applied only as to those payments which became due more than six years prior to the institution of the suit. Then without any discussion of the matter and citing only one case, *Tschida v. Continental Casualty Company,* 48 *Misc.* 2d 61, 264 *N. Y. S.* 2d 72 (*Sup. Ct. spec. and trial term* 1965), a trial court opinion, the court granted summary judgment for defendant, apparently on the ground that as a matter of law Bowler was not totally and permanently disabled within the contemplation of Article 3 of the policy. The *Tschida* case is distinguishable. The accidental disability policy there provided for the continuance of benefits, after an initial 52-week period, for the time the insured "is wholly and continuously disabled and is under the regular care and attendance of a legally qualified physician or surgeon * * * and prevented by reason of said injury from engaging in each and every occupation or employment for wage or profit for which he is reasonably qualified by training, education or experience for a period not to exceed two hundred and eight weeks." 264 *N. Y. S.* 2d, at 74.

Marilyn Tschida had been trained as a dancer since she was four years of age and began a professional career before

reaching sixteen years. About three years later while appearing in a musical comedy she fell and injured her left knee. The injury was serious, required surgery as well as a long period of treatment and probably left her permanently unable to engage in professional dancing. Less than two years after the accident she resumed employment and since then was "almost" steadily employed either on a full or part time basis, as a model, a receptionist, a saleslady and thereafter for approximately a year and a half, until two months before the court's opinion was filed (it is unclear whether she was still working at the time of trial of the case without a jury), she was employed part time as a teacher in a modeling and charm school. The medical proof showed that she was able to perform work not requiring excess standing, walking, climbing or running. The court held that she was not wholly disabled within the terms of her policy. It is not necessary for us to agree or disagree with the fact finding on which the decision was based. The case is distinguishable from the present one factually, and even if applied here most favorably for the insurer, it would do no more than call for submission to the jury of the issue of whether plaintiff's disability was total and permanent under Article 3 of his policy. It would not justify a summary judgment against him on the basis of his answers to interrogatories and his deposition.

The Appellate Division did not pass upon the disability issue. As has been noted above, its affirmance of the judgment for defendant on the Article 3 aspect of the case was predicated upon the statute of limitations. For the reasons already stated the Appellate Division judgment is reversed. Since the trial court's decision was based on the adverse determination of the disability issue, that judgment is also reversed and the matter remanded for a plenary trial to permit the parties to introduce their full proof on the single issue remaining, i. e., whether at the end of the 200-week period Bowler was totally and permanently disabled as required by Article 3 of the insurance policy. If the trial

results in favor of plaintiff he is entitled to the 600 weeks' benefits in one lump sum with interest at 6% from December 2, 1957.

Also, as shown above, the trial judge granted summary judgment for plaintiff for $50, the 200th-week payment plus interest thereon from December 2, 1957, the date on which it was due. As to this payment he applied equitable estoppel to bar the defense of the limitation statute. The Appellate Division declared the statute applied and finding no estoppel reversed the judgment. Since we have found an estoppel against the company and since that last payment was due as a matter of law, we agree with the trial court that summary judgment for the amount due and interest was proper. Therefore, that judgment for plaintiff is reinstated.

Accordingly, the judgment of the Appellate Division is reversed and the cause is remanded to the trial court for proceedings consistent herewith.

*For reversal and remandment*—Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For affirmance*—None.