765 A.2d 1093 (2001)
336 N.J. Super. 630
Joseph B. AZZE and Maureen P. Azze, Plaintiffs-Appellants/ Cross-Respondents,
v.
HANOVER INSURANCE CO., A Corporation of the State of New Hampshire, Defendant-Respondent/Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted December 18, 2000.
Decided January 30, 2001.
*1094 Chazkel & Associates, East Brunswick, attorneys for appellants/cross-respondents (Michael Chazkel, of counsel, Jeffrey Zajac, on the brief).
Craig M. Terkowitz, Piscataway, attorney for respondent/cross-appellant (Derek A. Ondis, of counsel and on the brief).
Before Judges NEWMAN, BRAITHWAITE and WELLS.
This opinion of the court was delivered by WELLS, J.A.D.
Plaintiffs Joseph and Maureen Azze appeal from summary judgment dismissing their claim against their homeowners carrier, defendant Hanover Insurance Co. The motion judge determined that the statute of limitations barred the Azzes' claim. Hanover cross-appeals from the judge's ruling that an electrically-heated waterbed is a "household appliance" within the meaning of the policy. We reverse the judgment dismissing the claim and affirm the determination with respect to the waterbed.
*1095 The facts gleaned from the moving and opposing papers submitted to the motion judge are:
In 1995, the Azzes purchased a homeowner's insurance policy from defendant, Hanover Insurance Company. The policy covered the time period between midnight, August 1, 1995, and midnight, August 1, 1996. The policy covered the following six types of loss: (A) Dwelling; (B) Other Structures; (C) Personal Property; (D) Loss of Use; (E) Personal Liability; and (F) Medical Payments to Others. The policy was accompanied by a "Homeowner's Policy Reference Guide," which explained the terms of the Azzes' insurance coverage. The reference guide made the following statement with regard to coverage for loss to personal property:
We insure for direct physical loss to the property described in Coverages A and C caused by a peril listed below unless the loss is excluded in Section IExclusions.
1. Fire or lightning.
2. Windstorm or hail.
....
3. Explosion.
4. Riot or civil commotion.
5. Aircraft, including self-propelled missiles from spacecraft.
6. Vehicles.
7. Smoke, meaning sudden and accidental damage from smoke.
....
8. Vandalism or malicious mischief.
9. Theft, including attempted theft and loss of property from a known place when it is likely that the property has been stolen.
....
10. Falling objects.
....
11. Weight of ice, snow or sleet which causes damage to the inside of a building or property
....
12. Accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.
The "Definitions" section of the homeowner's policy reference guide did not include a definition of the term "household appliance ."
In addition, the reference guide contained the following clause: "8. Suit Against Us. No action can be brought unless the policy provisions have been complied with and the action is started within one year after the date of loss."
On August 15, 1995, in the Azzes' home, an electrically-heated king-sized waterbed burst during routine maintenance. This mishap sparked an extensive flood throughout the home. Because the walls and ceiling of the home were constructed from plaster, water filtered throughout the structure, resulting in substantial damage to both the home and much of its contents.
Following this occurrence, the Azzes retained an insurance adjuster to help them submit their claim to Hanover. They submitted both a structural damage and a personal property loss claim (covered as Loss Types "A" and "C" in the homeowner's policy, respectively).
On September 6, 1995, Jay Vigneaux, a claims adjuster from Hanover, sent the Azzes a letter in response to their claim. The letter referred to an inspection that Mr. Vigneaux had performed on the residence on August 18, 1995. Mr. Vigneaux informed the Azzes that, in the opinion of Hanover, their homeowner's insurance covered the structural damage (coverage "A") that had occurred as a result of the waterbed accident, but not the personal property damage (coverage "C"). Mr. Vigneaux's letter pointed to the language in the policy, quoted above, which enumerated the twelve "named perils" covered by the coverage "C" property damage section of the policy. The letter stated: *1096 In referring to the above-named perils, please address number 12. "Accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance." Our investigation, through the use of Property Loss Research Bureau, defines a waterbed as a means of supporting the body in a reclining position. Additionally, a waterbed is considered a container. It does not seem that the form writers intended or that the insured could reasonably expect that the term "household appliance" would include such containers.
Since Coverage CPersonal Property is named peril and there are no perils which include the bursting of a waterbed, we will be unable to provide coverage for this portion of the claim.
In specifying these grounds for denial, we do not intend to waive, but rather specifically reserve all our rights under the contract of insurance including, but not limited to, other defenses which may be applicable to your claim. Additionally, we continue to require full and complete compliance with all terms and conditions of the policy.
If you have any questions or further information which may become pertinent, please contact us so that we may consider it.
Should you wish to take this matter up with the New Jersey State Insurance Department, you can write them at State of New Jersey Department of Insurance, Division of Enforcement and Consumer Protection, CN329, Trenton, New Jersey XXXXX-XXXX.
The letter did not contain any information regarding the one-year statute of limitations, nor did it suggest that the Azzes should engage the services of an attorney if they were dissatisfied with the defendant's position.
The Azzes took no further action regarding the personal property portion of their claim, focusing instead on performing the structural repairs necessary to collect payments from the defendant on their claim for damage to the home, under Coverage "A" of the policy. The Azzes state that these repairs were completed in 1996, and Hanover paid for the structural repairs.
In January 1997, one year and three months from the date of Hanover's letter, the Azzes sent a letter to Hanover regarding the personal property loss claim. In that letter, they registered their objection to Hanover's position that an electrically-heated waterbed was not a "household appliance" within the meaning of the term as used in the policy, and requested reconsideration of that position. They contended in the letter that, since no definition of "household appliance" was given in the policy terms, an ambiguity therefore existed that must, by New Jersey law, be construed in favor of the insured.
On January 30, 1997, Hanover replied, stating that "We will be standing firm behind our decision." This letter, like its predecessor, did not suggest that the Azzes contact an attorney, nor did it allude to the contractual one-year statute of limitations.
In an attempt to have the personal property claim paid, the Azzes wrote to the New Jersey Department of Insurance, as had been suggested by Hanover in its first letter of September 1995. The Department responded on August 8, 1997, noted that it was not in a position to act as an arbitrator in such a dispute, and suggested that the Azzes consult an attorney.
On October 23, 1997, the Azzes filed a complaint seeking enforcement of insurance coverage under their homeowner's policy. Hanover answered on January 28, 1998.
In July 1999, Hanover filed a motion for summary judgment, asserting that the statute of limitations precluded the Azzes' claim. The Azzes cross-moved for summary judgment on August 10, 1999.
*1097 On August 20, 1999, oral argument on both motions was heard. The judge entered an order granting Hanover's motion for summary judgment and denying the Azzes' cross-motion. The court determined that the one year statute of limitations contained in the policy barred the Azzes' suit. However, the court also determined that, under the insurance policy in question, an electrically-heated waterbed could be considered an "appliance" for purposes of coverage. The present appeal and cross-appeal followed.

I.
By its terms, the Hanover policy granted the Azzes one year from the date of this loss in which to file suit against the insurer. In New Jersey, the same six-year statute of limitations that applies to contractual actions would ordinarily apply to insurance actions. Breen v. New Jersey Manufacturers Indemnity Ins. Co., 105 N.J.Super. 302, 309, 252 A.2d 49 (Law Div.1969), aff'd, 109 N.J.Super. 473, 263 A.2d 802 (App.Div.1970); N.J.S.A. 2A:14-1. However, that period may be shortened by the terms of an insurance contract. James v. Fed. Ins. Co., 5 N.J. 21, 73 A.2d 720 (1950). Therefore, as both parties agree, the contractual one-year statute of limitations found in the terms of the Azzes' insurance policy is binding on them.
What is at issue is whether the operation of the "equitable tolling doctrine" allows the plaintiff to bring this suit more than a year after the accrual of the personal property loss.
According to Scott G. Johnson, The Suit Limitation Provision and the Equitable Tolling Doctrine, 30 Tort & Ins. L.J. 1015 (1995), suit limitation provisions such as the one in the plaintiff's policy are commonly found in property insurance policies. According to Johnson,
Two divergent interpretations of suit limitation provisions have emerged. Some courts strictly interpret the suit limitation provision, holding that the limitation period begins to run on the date of loss. Other courts have recognized the principal of equitable tolling. Under the most common tolling theory, the suit limitation period is tolled from the time the insured gives notice of the loss to the insurer until the insurer formally denies liability. The New Jersey Supreme Court first recognized the equitable tolling doctrine in Peloso v. Hartford Fire Insurance Co.

[Johnson, supra, 30 Tort & Ins. L.J. at 1017.]
In Peloso v. Hartford Fire Ins. Co., 56 N.J. 514, 267 A.2d 498 (1970), the Court determined that contractual limitation provisions should not be read literally, with the one-year period running uninterrupted from the date of the loss. According to the Court, such a reading of these provisions would be unfair, because it would allow, in effect, a ticking away of the limitations period while the insurance company investigated the loss. Peloso stated that
[T]he fair resolution ... is to allow the period of limitation to run from the date of the casualty but to toll it from the time an insured gives notice until liability is formally declined. In this manner, the literal language of the limitation is given effect; the insured is not penalized for the time consumed by the company while it pursues its contractual and statutory rights to have a proof of loss, call the insured in for examination, and consider what amount to pay; and the central idea of the limitation provision is preserved since an insured will have only 12 months to institute suit.
[Peloso, 56 N.J. at 520, 267 A.2d 498.]
From the passage above, it becomes evident that between the time the insured gives notice of loss and the time that the insurance company "formally denies coverage," the statutory period is tolled. Peloso does not, however, specifically declare what sort of denial of coverage by the insurer should be considered sufficiently *1098 "formal" to end the tolling period and restart the clock on the one-year period.
The Azzes' argument rests upon the contention that the denial letter sent by defendant in September 1995 did not meet the requirement for "formal" denial under Peloso, and that, therefore, the one year limitation should have been tolled from the date of the reporting of the loss, in August 1995, until January 1997, when the defendant unequivocally denied coverage. The motion judge found that "the language of the September 1995 letter was unequivocal and clearly demonstrates a denial."
We disagree. We, however, reject the first reason the Azzes offer for reversal. They assert that the September 1995 letter does not qualify as a formal denial because it does not conform to requirements set out under Bowler v. Fidelity & Casualty Co. of New York, 53 N.J. 313, 250 A.2d 580 (1969).
In Bowler, plaintiff held an accident insurance policy purchased from the defendant insurance company. The terms of the policy dictated that in case the insured was totally disabled by an injury, the insurer would pay $50 per week, for up to 200 weeks. If, by the 200th week, the insured was found to be permanently and totally disabled, the insurer would pay $50 per week for an additional 600 weeks.
In an accidental fall, plaintiff broke his leg, and subsequently developed a chronic infection, which resulted in total disability. The plaintiff submitted a claim to defendant, who paid $50 weekly, for 199 weeks. The insurance company then did not pay the 200th week, fearing that a payment for that week would amount to an admission that the insured was now entitled to the 600 additional weeks for permanent disability. According to the Bowler Court, the insurance company,
Instead of fulfilling its contractual obligations... lapsed into silence, and not only failed to pay the 200th week but ignored the practically conclusive proof of [plaintiff's] total and permanent disability... [P]ayment of benefits was cut off without a word.... [Plaintiff], a layman obviously not versed in insurance law, took no legal action until ... he got into the hands of an attorney, and this suit was broughtmore than six years after the end of the 200 week total disability period. When this was done, the insurer pleaded the six-year statute of limitations ... as a bar. We regard such treatment of its policyholder as shocking and unconscionable.
[Id. at 326, 250 A.2d 580.]
The Court found that the defendant's actions constituted an "obvious breach of its duty of good faith and fairness in the handling of its contractual undertaking." Id. at 330, 250 A.2d 580. Consequently, the Court found that the defendant was estopped from raising the statute of limitations defense. Id. at 337, 250 A.2d 580.
The Azzes point to the following language in Bowler which, they contend, mandates that certain requirements be fulfilled before an insurance company's denial letter will be considered to be a "true" denial:
[The insurance company] must notify the insured of its decision not to pay his claim. But mere naked rejection would not be sufficient. The giving of such notice should be accompanied by a full and fair statement of the reasons for its decision not to pay the benefits, and by a clear statement that if the insured wishes to enforce his claim it will be necessary for him to obtain the services of an attorney and institute a court action within an appropriate time. The "appropriate time" means the time remaining under the policy or the applicable statute of limitations within which the suit must be brought. Failure on the insurer's part to follow such a course, will bar reliance on the statute of limitations or a time restriction on court action expressed in the policy.
[Id. at 328, 250 A.2d 580.] *1099 The Azzes assert that, because the denial letter sent in September 1995 lacked a statement regarding the limitations period or the need for legal counsel, the above passage in Bowler means that, as a matter of law, the 1995 letter cannot operate as a legal denial of coverage. This passage, taken out of context, might well lead one to believe that the Bowler Court did, in fact, announce a sweeping new requirement for all insurance company denials of claims. Hanover, however, argues for another reading of Bowler. It asserts that "the Bowler Court based [its] decision upon the breach of the duty of fair dealing. In a situation where there has been no breach of the duty, the reasoning behind the Bowler decision is not present."
We agree with Hanover's analysis of Bowler. When that case is examined as a whole, it becomes clear that its application is not meant to be nearly as sweeping as the Azzes imply. Bowler dealt with a situation in which an insurance company, which had every reason to believe that it owed coverage to the insured, avoided its obligation to provide such coverage by literally dropping out of sight. The requirements for denial outlined in the passage above are meant to remedy only that situation and others like it, where the insurer's duty of good faith and fair dealing are at issue. This becomes much more apparent when one puts the quoted passage into the context of the paragraphs that precede it. Stated the Court in those preceding paragraphs:
In situations where a layman might give the controlling language of the policy a more restrictive interpretation than the insurer knows the courts have given it and as a result the uninformed insured might be inclined to be quiescent about the disregard or non-payment of his claim and not to press it in a timely fashion, the company cannot ignore its obligation. It cannot hide behind the insured's ignorance of the law; it cannot conceal its liability. In these circumstances it has the duty to speak and disclose, and to act in accordance with its contractual undertaking. The slightest evidence of deception or overreaching will bar reliance upon time limitations for prosecution of the claim.
More specifically, in a situation such as that present here, if all or part of the benefits provided by the policy clearly is due, the insurer must make the payment. If it fails to do so, and the statute of limitations or a policy limitation intervenes before suit is started, it will be estopped to plead the limitation in avoidance of a trial on the merits of the claim. Further if the insurer has factual information in its possession substantially supporting the policyholder's right to benefits, but it has a reasonable doubt as to whether the evidence is sufficient to require payment, the obligation to exercise good faith, upon which it knows or should know the insured is relying, cannot be satisfied by silence or inaction. [Here the passage quoted in plaintiff's brief beings.]
[Id. at 328, 250 A.2d 580 (emphasis added).]
Clearly, the stringent notification requirements in Bowler are meant to prevent an insurance company from disclosing the likelihood that it will be held liable, when such likelihood exists.
Other sources reinforce our reading of Bowler. For example, William T. Barker and Donna J. Vobornik, The Scope of the Emerging Duty of First-Party Insurers to Inform their Insureds of Rights under the Policy, 25 Tort & Ins. L.J. 749 (1990), analyzes Bowler as follows:
Read broadly, [Bowler] could suggest a duty to notify the claimant of many things, including the time period allowed for bringing suit, on every non-frivolous claim that an insurer declines to pay. But the New Jersey courts have not read it so. Indeed, there is hardly any case law citing Bowler for its statute of limitations holding and none relying on a failure of notice to preclude use of the statute of limitations. Thus, Bowler *1100 should be read to require notice only where the insurer has received evidence approximating a prima facie case of entitlement to benefits and, perhaps, only where the insurer is on notice (because of policy language that a layman is likely to misunderstand or otherwise) that notice is necessary for the insured to exercise available rights, including the right to deny the claim.
[Id. at 753, 250 A.2d 580.]
Hanover's situation here is clearly distinguishable from the facts in Bowler. Hanover did not possess any information which substantially supported the Azzes' rights to recover for damages to personal property caused by a burst waterbed. Hanover's letter of September 1995 makes it plain that it knew that the cause of the property damage was the sudden release of water from the electrically-heated waterbed, and that it simply construed the policy to exclude waterbeds from the category of "household appliance." Hanover contends that its research only bolstered this analysis, an assertion not disputed by the Azzes. Furthermore, the Azzes never contended that Hanover had any legitimate reason to believe that it was more likely than not that the Azzes would prevail at trial in an argument that an electric waterbed is a "household appliance." Therefore the good faith of Hanover in denying the claim is not an issue, making Bowler distinguishable, and its requirements do not apply to the defendant's denial letter.[1]
During the motion hearing, the motion judge stated that:
Plaintiff argues that the defendant did not outright reject or deny their claim. I think the ... language of the letter is unequivocal and clearly demonstrates a denial.
It is on this ruling that we part company with the motion judge. We find that the letter is ambiguous. The letter of September 1995 contained the following passage:
Since Coverage CPersonal Property is named peril and there are no perils which include the bursting of a waterbed, we will be unable to provide coverage for this portion of the claim.
In specifying these grounds for denial, we do not intend to waive, but rather specifically reserve all our rights under the contract of insurance including, but not limited to, other defenses which may be applicable to your claim. Additionally, we continue to require full and complete compliance with all terms and conditions of the policy.
If you have any questions or further information which may become pertinent, please contact us so that we may consider it.
Should you wish to take this matter up with the New Jersey State Insurance Department, you can write them at State of New Jersey Department of Insurance, Division of Enforcement and Consumer Protection, CN329, Trenton, New Jersey XXXXX-XXXX.
First, the letter is ambiguous because it refers to the submission of new information. One might reasonably wonder why Hanover would request more information, if coverage has already been unequivocally denied due to its definition of "household appliance." A very rational conclusion would be that the denial is not, in fact, final, but instead represents a preliminary finding that remains open to revision. A California case supports this very interpretation. In Prudential-LMI *1101 Comm. Ins. v. Superior Court, 51 Cal.3d 674, 274 Cal.Rptr. 387, 798 P.2d 1230 (1990), the California Supreme Court was faced with a situation very similar to the one at hand, where it had to determine how long the suit limitation period on a property insurance policy should be tolled. In that case, the insured plaintiffs had received a letter from the insurer "proposing that coverage would be denied based on the ... exclusion unless the insureds had any additional information that would favor coverage." Id. at 692, 274 Cal.Rptr. 387, 798 P.2d 1230. This letter began a series of negotiations between the insured and insurer, finally resulting in a formal and unequivocal denial some months later. The California Supreme Court elected to toll the running of the limitation period until the unequivocal denial, and not the denial that invited the submission of more information. Id. at 693, 274 Cal.Rptr. 387, 798 P.2d 1230.
Second, the letter also suggests that if the Azzes are unhappy about the decision, they should contact the Department of Insurance (DOI). This language could reasonably lead a person to conclude that contact with DOI was actually a prerequisite to a lawsuit. Similarly, it could also lead the insured to believe such a contact would result in the resolution of the claim, so as to render a lawsuit unnecessary. The suggestion by the insurer that the insured contact DOI gives the distinct impression that the insurer's denial might in some way be influenced by DOI, contributing to the general equivocality of the denial.
Third, the denial letter is not sufficiently unequivocal, because of the special circumstances that surrounded the claim in this case. Here, the Azzes were dealing with Hanover on two separate claims. At the time that the denial letter regarding the personal property claim under Coverage "C," was sent, the Azzes were concurrently dealing with Hanover on payment of the Coverage "A" structural damage claim, which stemmed from the same waterbed incident. In fact, the record shows that the Azzes' delay in addressing their personal property claim might well have resulted from their attempts to repair their home and obtain reimbursement from Hanover. Clearly, the record shows that the parties were engaged in negotiations regarding the structural damage claim well into 1996. Because both claims stemmed from the same homeowner's policy, and because negotiations regarding a section of that claim were ongoing well after the September 1995 denial letter, a reasonable insured might well believe that the limitations period would not restart until after the structural damage claim was settled.
We conclude for the above reasons that the September 1995 letter was not an unequivocal denial, and that the tolling of the limitations period begun in August 1995 thus did not stop until January 1997. Accordingly, the present action was timely filed.

II.
Hanover also denied coverage for the personal property portion of the claim, asserting that a waterbed was not a household appliance, and that therefore the accident was not covered. The motion judge determined that a waterbed should be considered a "household appliance" for purposes of the policy. Hanover argues on cross-appeal that the motion judge erred in that finding.
Hanover begins its argument by stating that there is no case law in New Jersey that defines the term "household appliance." But in Stone v. Royal Ins. Co., 211 N.J.Super. 246, 249, 511 A.2d 717 (App. Div.1986) we held that "An appliance is a tool, instrument or device adapted for a particular use[.]" Stone then applies this definition of "appliance" as though it also defines "household appliance." Therefore, we define "household appliance" as a tool, instrument or device adapted for a particular use in a house. Ibid. The device in *1102 Stone was a hose connecting a sump pump to a drain in the basement.
Generic description of "household appliance" aside, the fact is that the Hanover policy does not define a "household appliance." The failure to define a term in a policy of insurance has been construed to render it ambiguous. In Property Cas. Co. of MCA v. Conway, 147 N.J. 322, 326, 687 A.2d 729 (1997) the Court stated:
One of the most basic precepts governing judicial construction of insurance policies is that courts construe ambiguities liberally in favor of the insured. Longobardi v. Chubb Ins. Co., 121 N.J. 530, 537, 582 A.2d 1257 (1990). Insurers write the policies, and fairness suggests that insureds should receive the benefit of any ambiguities. By failing to define "accident," PCC has introduced ambiguity into the definition of "occurrence." Consequently, in defining "accident" and "occurrence" we shall construe any ambiguity against the insurer and in favor of the insured.
Furthermore, insurance contracts are contracts of adhesion, and therefore subject to liberal construction so as to benefit the insured. Meier v. New Jersey Life Ins. Co., 101 N.J. 597, 611, 503 A.2d 862 (1986). The question, therefore, is whether, using the standard of liberal construction, an electrically-heated waterbed could reasonably be considered a tool, instrument or device adapted for a particular purpose. We concur with the motion judge that it can, for the reasons that follow.
Defendants rest a large portion of their argument on a Florida case, West American Ins. Co. v. Lowrie, 600 So.2d 34 (Fla. Dist.Ct.App.1992), which asserts that a waterbed is furniture, and not an appliance. We are, of course, not bound by the decisions of Florida courts, and our law suggests that we should treat this particular waterbed otherwise.
First, a waterbed in New Jersey could be both furniture and a household appliance. We have noted that Stone v. Royal Ins. Co., 211 N.J.Super. 246, 249, 511 A.2d 717 (App.Div.1986) dealt with the question of whether a sump pump could be considered a "household appliance" for purposes of insurance coverage. The issue in this case was whether the pump was, in fact, a "fixture." The court clearly held that "`appliance' and `fixture' are not mutually exclusive terms. An appliance ... can be a fixture." Id. at 249, 511 A.2d 717. If a fixture can also be an appliance, then there is no reason that something ordinarily considered furniture cannot also be an appliance.
Second, waterbeds, like the one involved here, are generally purchased with heating units which plug into the household electric current like washing machines and dishwashers, appliances which also contain water. They provide warmth as well as support. We draw an analogy to an electric blanket. Few people would consider a regular blanket to be an appliance. However, once one modifies a blanket so that it also provides heat electrically, this new item, an "electric blanket," suddenly takes on the characteristics of a household appliance. Note the certainty in the tone of the U.S. District Court in Remington Rand, Inc. v. Knapp-Monarch Co., 139 F.Supp. 613, 622 (E.D.Pa.1956), when it proclaims that "A nonexhaustive list of appliances are: Electric blankets, blenders, vacuum type coffee makers, hair dryers, fans, deep fat fryers, frypans, hand irons, food mixers, heating pads, corn poppers, vaporizers, massage vibrators, waffle irons and electric razors." We find that if a blanket becomes an appliance once it provides heat, so too does a waterbed.
For the reasons stated, we hold that a "household appliance" includes an electrically-heated waterbed.
Reversed in part, affirmed in part and remanded to the trial court.
NOTES
[1] Plaintiff's brief, on page 23, does assert that "The defendant's conduct clearly breached the principles of good faith and fair dealing required of insurance companies in this State[.]" However, the only proof the plaintiffs offer to show bad faith is the fact that defendant did not follow the Bowler requirements. This is a circular argument, since the Bowler requirements are clearly limited to situations where the insurance company knows or should know that plaintiff will prevail if a suit is initiated. If the Bowler requirements do not apply, then failing to follow them is hardly a per se showing of bad faith.