Penn-Air, Inc. *v.* Indemnity Insurance Company
of North America, Appellant.

512

Argued May 1, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Henry C. McCormick,* with him *Furst, McCormick, Lynn, Reed & Nichols,* for appellant.

*Martin M. Fine,* with him *Fine & Eisenbeis,* for appellee.

OPINION BY MR. JUSTICE POMEROY, July 2, 1970:

Penn-Air, Inc., the plaintiff-appellee, was a private airport operator whose business included the storage, maintenance and repair of airplanes. It purchased from Indemnity Insurance Company of North America, the

defendant-appellant, an aircraft policy which contained a "Hangar Keeper's Liability Endorsement". This appeal concerns a dispute between the two parties as to whether a loss sustained by appellee was or was not within the coverage afforded to appellee by the policy. The background facts, viewed most favorably to the appellee, the verdict winner below, are as follows:

Larry Herron, Inc., of Williamsport owned a twin-engine airplane which it stored at Penn-Air's hangar. On May 5, 1960 Penn-Air had possession of the plane for the purpose of giving it a one hundred hour inspection, which was to include a flight check on the following day by Mr. Taylor, Penn-Air's president, who with his wife is owner of its capital stock. Following the check-up but before the flight check, one William Angle, who was an employee of Herron and the plane's pilot, and one Richard Littley, an employee of Penn-Air and its chief mechanic, took the plane up. In so doing, Angle was acting outside the scope of his employment and Littley was likewise acting outside the scope of his employment and without authority from Mr. Taylor.[1] After climbing to about 500 feet the plane suddenly lost altitude and crashed after having traveled about a mile and a half. The aircraft was burned and totally destroyed, and both Angle and Littley were killed instantly. Which of the two men was piloting the plane was never determined.

---

[1]Whether the flight was unauthorized was the principal issue at trial. Mr. Taylor had filed a workmen's compensation report 8 days after the accident, stating that Littley was in the regular course of his employment, "as it is routine for the mechanic to accompany the pilot on a check flight." The court charged the jurors that they should return a verdict in favor of Penn-Air if the use of the aircraft was unauthorized and in favor of Indemnity if the use of the plane was authorized. Under the court's instructions, the verdict for plaintiff was virtually a special finding that the flight was unauthorized.

Prior to the present suit, Penn-Air was sued for the value of the airplane by Herron for breach of the contract of bailment. Following trial, the jury in that case returned a verdict in Herron's favor in the amount of $22,800. Penn-Air paid the judgment, with interest, and thereafter brought this suit for reimbursement claiming that the loss was covered by the insurance policy. The jury in the case at bar found for Penn-Air. The lower court overruled appellant's post trial motions, and this appeal followed.[2]

Penn-Air's complaint averred that the Herron aircraft was destroyed when Penn-Air negligently failed to prevent Angle or Littley or both from taking unauthorized possession of the plane or from converting or stealing it; that the plane was destroyed as a result of "the unauthorized taking or theft"; and that the loss thus suffered was within the scope of Coverage B(1) or B(2) of the policy. Indemnity's answer denied coverage and asserted that the insured had not complied with the provisions of the policy as to timely notice of claim, proof of loss, and commencement of suit.

The coverage which Penn-Air carried with Indemnity was "Coverage B". The text of the insuring agreement relative to this coverage is as follows: "Indemnity Insurance Company of North America . . . Agrees with the insured . . . to afford those of the following coverages as specified in the declarations: Coverage B—All Risks of Physical Damage While Not in Flight and Fire, Explosion and Lightning in Flight Except Following Crash. To Pay For: (1) Any loss of or damage to the aircraft while not in flight.[3] (2) Loss of or dam-

---

[2] The appeal is only from the refusal of the motion for judgment n.o.v., not from the refusal of a new trial.

[3] The words "In Flight" and "Not in Flight" are defined in the policy as follows: "The aircraft shall be deemed in flight during the period of time commencing with the actual take-off run and continuing thereafter until it has completed its landing run. The

age to the aircraft while in flight[3] caused by fire, explosion, lightning, theft, robbery or pilferage, excluding fire or explosion caused by or resulting from collision of the aircraft with the ground, water or any object; including the cost of salvaging the aircraft following a forced landing caused by fire, lightning or explosion while in flight. . . ."[4] The Hangar Keeper's Liability Endorsement extended the coverage to "liability imposed by law upon the insured as bailee for direct loss or damage as hereinafter specified to aircraft which are the property of others and in the custody of the insured for storage, repairs or safekeeping . . . only while the said aircraft are in or on the premises specified below." (City Hangar, Williamsport Airport, Williamsport, Pennsylvania.)

The theory of Penn-Air and the basis of the decision in its favor by the court below was, in the words of the court's opinion, that "there was a 'loss of' the aircraft when there was an unauthorized taking from the plaintiff's possession, and that damages directly sequential to the taking were compensable. The physical damage which occurred followed the taking of the plane, in direct unbroken sequence. . . . The risk insured was the 'loss of or damage to' the plane while it was in plaintiff's possession. . . . [T]he destruction of the plane as a consequence of an incident in flight operated to establish the extent of the damages, nothing more." The court thus found coverage under clause B(1),

aircraft shall be deemed not in flight under all circumstances, except during the period of time commencing with the actual take-off run and continuing thereafter until it has completed its landing run."

[4]The policy contained a "C" coverage, which would have included any loss of or damage to the aircraft while not in flight or while in flight, with no exclusion or limitation. The policy declaration stipulates that the insurance afforded is only with respect to such coverages as are indicated. Only coverage B was so indicated.

*supra,* of the policy, insuring against loss to the aircraft "while not in flight".

We are unable so to read the policy. What is insured against in clause (1) is "loss of or damage to the aircraft while not in flight" (not only, as the court below indicated, while the aircraft was in the appellee's possession). It is indisputable that the actual physical destruction of the plane occurred when it fell from the air, crashed to the ground and burned. Was this destruction the loss insured against, or was the unauthorized taking the loss insured against? The lower court held the latter and concluded that since the taking occurred on the ground, clause (1) provided coverage.[5] We think this is a strained construction and not consonant with the language of the policy. It seems clear that loss or damage is one thing, and the cause of it another. Thus clause (1) insures against *any* loss or damage, however caused, while not in flight. Clause (2), on the other hand, insures against loss or damage while in flight if it is "caused" by certain specified things, including fire, lightning, and theft. The loss or damage is not the same as the fire or the lightning or the theft which causes it; it is the resultant total or partial destruction of the aircraft. This distinction is evident in other parts of the policy. Thus under Exclusions, "loss or damage due to strikes, riots or civil commotion" is not covered, nor is any loss or damage "caused by or resulting from . . . hostile or warlike action . . . or insurrection . . ." Another provision states that the policy does not apply with respect to coverages A, B and C "to loss due to conversion, embezzlement or secretion by any person in lawful possession of the aircraft under a lease, conditional sale, mortgage or

---

[5] If the taking occurred on the ground but concurrently with the takeoff run, it would be an "in flight" occurrence and not within clause B(1).

other encumbrance." It is evident that the physical harm to the aircraft is what is covered, and this is nowhere equated with the act or condition giving rise to or occasioning the harm. This construction is further supported by reference to provisions in the Conditions section of the policy. For example, "The company's liability for loss of or damage to the aircraft shall not exceed the actual cash value thereof at the time any loss or damage occurs." Again, the insurer is given the option to "pay for the loss in money or may repair or replace the aircraft or any lost or damaged part thereof, or may return any lost or stolen property and pay for any resultant damage thereto, if such property be found before the loss is otherwise settled with the insured."

It is of course true that an insurance policy is to be construed most strongly against the insurer and liberally in favor of the insured so as to effect the dominant purpose of indemnity or payment to the insured, but this is where the terms of the policy are ambiguous or uncertain and the intention of the parties is therefore unclear. See e.g., *Cadwallader v. New Amsterdam Casualty Co.*, 396 Pa. 582, 152 A. 2d 484 (1959) ; *Beley v. Mutual Life Ins. Co.*, 373 Pa. 231, 95 A. 2d 202 (1953), 43 Am. Jur. 2d §271. We find no ambiguity in the clause before us, and, as the United States Court of Appeals for the 9th Circuit put it, "Courts do not resort to forced construction in order to fasten liability upon an insurer which, by the terms of the policy, it has not assumed." *Standard Accident Ins. Co. v. Winget,* 197 F. 2d 97 (9th Cir. 1952).

We hold that the unauthorized taking did not itself constitute the loss; that the loss was the destruction of the aircraft following the crash after flight; and that this loss is not covered under clause B(1) of the policy insuring agreements.

We turn to Clause B(2) of the insuring agreements. Under its terms, if a theft of the airplane took place while the plane was in flight, as that term is defined in the policy, the loss of the plane would be the result of the theft.[6] While the complaint spoke in terms of stealing and theft as well as of conversion and claimed coverage under B(2) as well as B(1), there was no proof at trial that the taking was felonious, i.e., a larceny, and the court did not charge the jury with respect to what it must find to bring the taking within the category of theft and therefore bring the loss within the coverage of clause (2). On appeal, however, Penn-Air argues, alternatively to its clause (1) position, that if the loss did not consist of a conversion of the plane while not in flight, it did consist of a theft while in flight, or at least that the in flight theft caused the loss.

To reach this result, Penn-Air quotes a secondary meaning of the word "theft" from Black's Law Dictionary (4th Ed., p. 1647-8) to the effect that it is a wider term than larceny and that "one who obtains possession of property by lawful means and thereafter appropriates the property to the taker's own use is guilty of a 'theft'." But the primary meaning of theft, as stated in Black, is that it is a popular name for larceny, and this is also the Pennsylvaia meaning. "By theft is meant larceny in its common law sense." *Hilliard Lumber Co. v. Harleysville Co.*, 175 Pa. Superior Ct. 94, 96, 103 A. 2d 436 (1954). "At common law", continues Judge HIRT's opinion, "larceny consists in the taking and carrying away of the personal property of another

---

[6]The exclusion under clause B(2) relative to collision with the ground, water or other object refers only to loss from fire or explosion resulting from such a collision; contrary to Indemnity's reading, it does not extend to lightning, theft, robbery or pilferage. See *Butche v. Ohio Casualty Ins. Co.*, 174 Ohio St. 144, 187 N.E. 2d 20, 22 (1962).

with the mind of a thief, that is, with the specific intent to deprive the owner permanently of his property." In *Thomas v. Kessler*, 334 Pa. 7, 9, 5 A. 2d 187 (1939), this Court defined larceny in the following terms: "Larceny is 'the *felonious* taking and carrying away of the personal goods of another': 4 Blackstone 230. 'Larceny may be defined to be the *fraudulent* taking and carrying away of a thing *without claim of right,* with the intention of converting it to a use other than that of the owner, without his consent': 2 Wharton's Criminal Law, Sec. 1097." (Emphasis supplied.) The Court then held, relying on *Commonwealth v. Wilson,* 266 Pa. 236, 109 Atl. 913 (1920), that when one takes property under a claim of right, even though mistaken, larceny is not committed. "One of the elements of larceny is a specific intent to steal (animus furandi)—an intent to convert the goods wrongfully to the taker's own use or permanently deprive the owner of their possession." *Commonwealth v. Meinhart,* 173 Pa. Superior Ct. 495, 500, 98 A. 2d 392 (1953).

The Superior Court has had occasion to apply these principles to policies insuring against loss caused by theft of automobiles: *Hilliard v. Harleysville Co., supra; Seither v. Pa. Mfg. Ass'n. Cas. Ins. Co.,* 104 Pa. Superior Ct. 260, 159 Atl. 53 (1932); *Slomowitz v. Union Ins. Co. of Canton,* 90 Pa. Superior Ct. 366 (1927). In all of these cases there was loss or damage following unauthorized taking; in all of them it was recognized that whether or not such taking was a theft depended on the plaintiff showing by a preponderance of the evidence that there was a felonious intent, "an intent to steal". In *Slomowitz* the insured's car was taken for an unauthorized ride by a discharged chauffeur of the insured, wrecked and abandoned; the jury found in favor of the insured, the Superior Court found no error, and affirmed. In *Seither* the jury found in favor of the insured, the Superior Court found no evi-

dence of felonious intent, held that it was error to have submitted the case to the jury, and reversed. In *Hilliard* the jury found for the insured, the court below entered judgment n.o.v., the Superior Court held that there was circumstantial evidence from which the jury might have found the requisite criminal intent and reversed.

The facts in *Seither* are similar to those in the case at bar in that the converter was a mechanic into whose custody the insured had delivered his car for the purpose of having repairs made. When the work was finished the mechanic took the car, with his family in it, for a ride, and collided with a pole, causing serious personal injuries and extensive damage to the car. There was some evidence that the mechanic had been drinking at the time. In the opinion of the court, by TREXLER, P. J., it was said at p. 264: "We have not gone so far in Pennsylvania that any unlawful taking is covered by the word 'theft.' . . . There must be some fact about the transaction from which it may be found that the matter was done animo furandi. We fail to find one. The sum and substance of the evidence presented by the plaintiff is that Wachter without right took the car to afford his relatives the pleasure of a ride. If there were the least evidence that the purpose was to flee with the car, or to dispose of it, or any act inconsistent with the intention to return it to the garage after the ride was completed, there might be something for the jury to consider, but as the case was presented, we find nothing that should have been submitted to them for their decision."

In *Hilliard,* the person who took the automobile, at night and without permission, was the 26 year old son of the insured owner's employee, who did not live with his father in a family relationship. The car was wrecked 25 miles from where it had been taken. Upon discovering that the car was missing and that his son also was

missing, the father had called the police because he "wanted to find out before he [the son] got into any trouble to get the truck back if I could." The son did not appear as a witness at trial. The court recognized that to constitute theft "There must be a criminal intent permanently to deprive an owner of his property", but felt that these facts were sufficiently different from those of *Seither* to permit the case to go to the jury.

We think the case at bar is closer to *Seither* than to *Hilliard*. We fail to find any fact about the transaction here from which it may be fairly inferred that the plane was taken *animo furandi*. It must be borne in mind that the pilot was the bailor's regular pilot of the plane, and that the other person involved was the insured bailee's chief mechanic who had just completed working on the plane. The event took place in the daylight. No suspicious circumstance was shown to indicate any intent on the part of these men not to return to the hangar. There is, in fact, nothing but the taking itself, without authority of their respective employers, from which an inference of criminal intent can be drawn. We hold that this was not sufficient.

Even were we to hold otherwise, there would still remain the hurdle of finding that the theft, supposing one occurred, took place in flight, meaning at some point of time commencing with the takeoff run and before the crash. There is not a shred of evidence as to this, and any finding on the subject by a jury would be the sheerest conjecture. For these reasons the failure to charge on the theft theory is immaterial, and no purpose would be served by ordering a new trial.

Because of our holdings as to the scope of the policy, it is not necessary to consider other arguments relative to compliance with the terms of the policy as to notice, proof of loss, and commencement of suit.

Judgment vacated and here entered for the appellant.

Mr. Chief Justice BELL concurs in the result.

Mr. Justice COHEN dissents.

———

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

The majority concludes that the loss would have been compensable if the airplane had just disappeared in the middle of the night and never again found, but that since the fate of the craft was known there could be no recovery. I cannot agree, and I would affirm the verdict of the jury and the conclusions of the trial judge. The insurance policy covered "any loss of or damage to the aircraft while not in flight," and I fail to see how the unauthorized taking involved in this case was anything other than a "loss of" the aircraft while not in flight.