388 A.2d 1346

**Kazuko COLLISTER, Appellant,**

v.

**NATIONWIDE LIFE INSURANCE COMPANY, Appellee.**

Supreme Court of Pennsylvania.

Argued Jan. 11, 1977.

Decided June 13, 1978.

Reargument Denied July 21, 1978.

Campana & Campana, Ambrose R. Campana, Williamsport, for appellant.

C. Edward S. Mitchell, Williamsport, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

MANDERINO, Justice.

On or about September 24, 1972, appellant's husband applied to appellee Nationwide Life Insurance Company for life insurance in the amount of $10,000.00, with double indemnity for accidental death, plus $22,500.00 level term insurance. Appellee, through its agent, accepted $60.66 from appellant's husband at the time of the application. This amount represented a two-month premium payment on the above described insurance. In exchange for this payment appellee's agent gave appellant's husband a "conditional receipt."

On November 4, 1972, appellant's husband was killed in an automobile accident. At the time of appellant's husband's death Nationwide had neither issued the policy applied for nor had it rejected the application. Nor had appellant's husband taken the medical examination required by the wording of the application. Subsequent to appellant's husband's death, Nationwide denied liability, asserting that certain conditions contained in the application and in the conditional receipt (namely the taking of the medical examination) had not been fulfilled by the applicant.

The case was submitted to the trial court through appellant's complaint, Nationwide's answer, appellant's reply to appellee's answer, and the deposition of appellee's agent. Appellant then filed a motion for summary judgment and appellee filed a cross-motion for summary judgment. Both motions contained affidavits in support thereof. On the basis of these documents, the trial court ruled that a condition precedent to the insurance coverage claimed had not been fulfilled. Accordingly, the trial court denied appellant's motion for summary judgment and granted appellee's. On appeal, the Superior Court affirmed per curiam. *Collis-*

*ter v. Nationwide Life Insurance Co.*, 236 Pa.Super. 702, 347 A.2d 487 (1975). Appellant's petition for allowance of appeal was granted, Appellate Court Jurisdiction Act of 1970, Article II, § 204, 17 Pa.C.S.A. § 211.204(a), and this appeal followed.

Appellee contends that no insurance was in force as of November 4, 1972, the date of decedent's death, because the application and the "conditional receipt" each provided that there would be no insurance coverage unless a completed medical examination was received by the insurer. Since no medical examination was obtained by the applicant prior to his death, Nationwide argues that the application was never completed and that completion of the application was an unfulfilled condition precedent to the insurance coverage claimed.

▇ Appellant argues before us, as she did below, that a contract of insurance came into being between appellant's husband and Nationwide at the time Nationwide accepted the application form and the first premium payment. This transaction, urges appellant, created a temporary insurance contract that provided insurance coverage for the period of time extending from acceptance of the premium deposit until Nationwide either rejected the application because of the applicant's uninsurability or accepted the application and issued the policy applied for. For the reasons that follow, we agree with appellant.

At the outset, we note that temporary contracts of insurance affording coverage pending issuance of the formal policy by the insurer are well known in the insurance industry. See 12 Appleman, Insurance Law and Practice, §§ 7221–7233 (1943); 1 Couch on Insurance 2d, §§ 14:26–14:46 (1959). Contracts for interim insurance, such as appellant argues was in effect between Nationwide and her husband at the time of his death, have also been recognized as valid in Pennsylvania. For example, in *McAvoy Vitrified Brick Co. v. North American Life Assurance Co.*, 395 Pa. 75, 149 A.2d 42 (1959), we held that an application for insurance coverage, a deposit premium receipt, and an "interim assur-

ance certificate," constituted a contract to provide temporary insurance for the period of time between the delivery of the certificate and the subsequent decision of the insurer at its home office of whether to issue the policy applied for or reject the application. Like Nationwide here, the insurer in *McAvoy*, argued that its liability was subject to a condition precedent; in that case the alleged condition precedent was the insurer's good-faith determination that the applicant was an insurable risk.

The *McAvoy* court considered the conflicting points of view before arriving at its conclusion that a contract of temporary insurance existed. Quoting from the California Supreme Court's decision in *Ransom v. Penn Mutual Life Ins. Co.*, 43 Cal.2d 420, 274 P.2d 633 (1954), we said,

" 'The courts in several jurisdictions have construed clauses similar to the one involved here. A number of decisions have held, in accordance with defendant's view, that no contract of insurance exists until the insurer has been satisfied as to an applicant's acceptability, and that the provisions that the insurance shall be in force from the date of the application means that, if and when the company is satisfied, the contract shall be considered to relate back and take effect as of that date. (Citations omitted.)

On the other hand, a number of courts have held that the provisions to the effect that the insurance shall be in force from the date of the application if the premium is paid gives rise to a contract of insurance immediately upon receipt of the application and payment of the premium, and that the proviso that the company shall be satisfied that the insured was acceptable at the date of the application creates only a right to terminate the contract if the company becomes dissatisfied with the risk before a policy is issued.' " (Citations omitted.)

395 Pa. at 87–88, 149 A.2d at 48.

Similarly, in *Stonz v. Equitable Life Assurance Society*, 324 Pa. 97, 102, 187 A. 403, 405–406 (1936) we said:

"The cases previously cited indicate a trend in the courts to construe the conditions liberally, and to treat receipts similar in wording to the one before us as binding during the interim regardless of the ultimate action of the carrier on the application. These decisions are based upon the assumption that if the receipt meant anything, no other result could have been intended by the parties, *for unless the insured was to be protected* against injury or death during the interim period there would be no advantage to him in paying his premium in advance. As was said in *Albers v. Security Mutual Life Ins. Co.,* supra: 'If the company did not intend that there should be insurance effective pending the date of the application and the date of the approval of the risk and the issuance of the policy, then the company would be charging and obtaining the full amount of the premium for one year, while the period of actual insurance would be as many days less than one year as there were days intervening between the date of the application and the approval.' In other words, the insured would be paying for something which he did not receive." (Emphasis in original.)

The courts of several other jurisdictions have also recognized the validity of temporary insurance contracts. *See, e. g., Smith v. Westland Life Ins. Co.,* 15 Cal.3d 111, 123 Cal.Rptr. 649, 539 P.2d 433 (1975); *Damm v. National Ins. Co. of America,* 200 N.W.2d 616 (N.D.1972); *Toevs v. Western Farm Bureau Life Ins. Co.,* 94 Idaho 151, 483 P.2d 682 (1971); *Turner v. Worth Ins. Co.,* 106 Ariz. 132, 472 P.2d 1 (1970); *Simpson v. Prudential Ins. Co.,* 227 Md. 393, 177 A.2d 417 (1967); *Allen v. Metropolitan Life Ins. Co.,* 44 N.J. 294, 208 A.2d 638 (1965); *Ransom v. Penn Mutual Life Ins. Co.,* 43 Cal.2d 420, 274 P.2d 633 (1954).

The rationale of these cases is succinctly stated in *Smith v. Westland Life Ins. Co.,* supra, 123 Cal.Rptr. at 655, 539 P.2d at 439:

"In establishing for California a rule of temporary insurance, we acknowledged the existence in this country of two distinct but contradictory lines of authority on this

question. (*Ransom v. Penn Mutual Life Ins. Co., supra,* 43 Cal.2d at pp. 423–424, 274 P.2d 633.) We chose to align California with those jurisdictions recognizing temporary insurance, for a number of reasons: First, we found the language of the conditional receipt to be ambiguous and susceptible of the interpretation that coverage would be provided immediately subject to the insurance company's right to terminate coverage if it did not choose to issue the policy applied for. Resolving this ambiguity against the insurer, we held that coverage arose immediately upon completion of the application and payment of the premium. Second, noting that the insurance company drafted the language of the conditional receipt, we reasoned that if the insurer intended to condition its liability under the policy upon its prior approval of the application, it could have easily used clear and unequivocal language to indicate its intention. Third, we concluded that an ordinary person paying the premium at the time he applied for insurance and receiving in return a receipt which stated that coverage was to be effective as of the date of application, had a reasonable expectation that he would secure the benefit of immediate coverage. Finally, we noted the obvious advantage gained by the insurance company in receiving payment of the premium at the time of application. We therefore concluded that it would be unconscionable to allow the insurer, who had required from the applicant payment of the first premium, to escape the obligation of coverage which the applicant could reasonably assume and expect that the insurer was thereby undertaking."

As we said in *McAvoy, supra,* 395 Pa. at 80–81, 149 A.2d at 44–45.

"The problem is not a new one. A substantial volume of litigation has come before the courts arising out of situations in which one who has applied for life insurance and paid a premium has died or suffered a change of physical condition before the issuance of the policy. We are all familiar with the usual practice of insurance agents to

accept initial premium payments with applications for the issuance of policies which cannot, in the very nature of the business, be made available until some time later. The policy itself, when issued, embodies the contract. But in the meantime, between the initial payment of premium and the issuance of the policy, what is the contractual relationship, if any?"

*See also Smith v. Westland Life Ins. Co., supra,* 123 Cal.Rptr. at 656, 539 P.2d at 440.

In *Toevs v. Western Farm Bureau Life Ins. Co.,* 94 Idaho 151, 483 P.2d 682 (1971), the court noted:

"Three documents, all unilaterally prepared by the insurance company, are involved, viz., the application, conditional premium receipt, and the specimen policy. The three share the common characteristics of employing confusing and complicated language which is susceptible of various interpretations and meanings. The specific ambiguity involves the date upon which insurance coverage is to begin. Each of these documents when read alone is confusing; when all three are taken together the task becomes three times as difficult. Thus the provisions of the contract existing between the Western Farm Bureau Life Insurance Company and Adelle R. Toevs were confusing and ambiguous. It has long been the rule of this Court that a contract should be construed most strongly against the party preparing it." (Footnote omitted.) *Id.* 94 Idaho at 153, 483 P.2d at 684.

Furthermore, we recently stated in *Brakeman v. Potomac Ins. Co.,* 472 Pa. 66, 72, 371 A.2d 193, 196 (1977).

"The rationale underlying the strict contractual approach [in cases involving insurance contracts] reflected in our past decisions is that courts should not presume to interfere with the freedom of private contracts and redraft insurance policy provisions where the intent of the parties is expressed by clear and unambiguous language. We are of the opinion, however, that this argument, based on the view that insurance policies are private contracts in the traditional sense, is no longer persuasive. Such a

position fails to recognize the true nature of the relationship between insurance companies and their insureds. An insurance contract is not a negotiated agreement; rather its conditions are by and large dictated by the insurance company to the insured."

To accept the insurer's argument that its liability is contingent on a condition precedent permits the insurer to hold itself immune from liability while it considers whether to accept or reject the risk, as in *McAvoy*, or, as in the instant case, during the period between receipt of the application and premium deposit and the date of the medical examination, while at the same time enjoying the benefits that flow from immediate collection of the premium. *See, Turner v. Worth Ins. Co.*, 106 Ariz. 132, 472 P.2d 1 (1970). Viewing insurance contracts (including contracts for temporary insurance) as contracts of adhesion, the courts have accordingly imposed more stringent requirements upon the insurer. For example, some courts have ruled that because of the adhesionary nature of insurance documents (including conditional receipts similar to that at issue here) an insurer who wishes to avoid liability must not only use clear and unequivocal language evidencing its intent to limit temporary coverage, but it must also call such limiting conditions to the attention of the applicant. Absent proof of such disclosure, coverage will be deemed to be that which would be expected by the ordinary layperson, namely, complete and immediate coverage upon payment of the premium. In *Smith v. Westland Life Ins. Co., supra*, 15 Cal.3d 111, 123 Cal.Rptr. 649, 539 P.2d 433 (1975), the court stated:

"[T]he applicant [in *Young v. Metropolitan Life Ins. Co.*, 272 Cal.App.2d 453, 77 Cal.Rptr. 382] applied for life insurance under a plan providing double indemnity in the event of accidental death. He paid the premium at the time of application and received a conditional receipt which expressly and unambiguously stated that if the applicant died before the company had approved the policy, the company would pay the benefits provided by the policy, *not including accidental death benefits*. Young

died before his application was approved. The insurer claimed that its liability under the policy was limited by the terms of the conditional receipt.

While the court found that the language of the application and receipt clearly made company approval a condition precedent to the insurer's full liability under the policy, the court nevertheless ruled that the company must be held liable to the full extent under the policy applied for, including accidental death benefits, unless it satisfied the burden of proving that the provisions limiting the company's liability were called to the applicant's attention or that the applicant had read them. In so holding, the court reasoned that '*the very acceptance of an advance premium by the carrier tends naturally toward an understanding of immediate coverage though it be temporary and terminable . . .. In short, to the ordinary layman, payment of the insurance premium constitutes payment for immediate protection,* and it is unlikely that he would carefully read the fine print contained in a receipt unless he was given the incentive to do so by the carrier's agent." (Citations omitted.) (Emphasis in original.)

In an analogous situation, we have also concluded that the adhesionary nature of insurance documents is such that the insured is under no duty to read the policy sent by the company. *Rempel v. Nationwide Life Ins. Co.,* 471 Pa. 404, 370 A.2d 366 (1977).

In another related context, the Supreme Court of New Jersey has held that an insurance company has a duty to disclose to the insured policy provisions which might be at variance with the reasonable expectations of the insured. *Bowler v. Fidelity and Casualty Co. of N. Y.,* 53 N.J. 313, 250 A.2d 580 (1969).

"In situations where a layman might give the controlling language of the policy a more restrictive interpretation than the insurer knows the courts have given it and as a result the uninformed insured might be inclined to be quiescent about the disregard or non-payment of his claim and not to press it in timely fashion, the company cannot

ignore its obligation. It cannot hide behind the insured's ignorance of the law; it cannot conceal its liability. In these circumstances it has the duty to speak and disclose, and to act in accordance with its contractual undertaking. The slightest evidence of deception or overreaching will bar reliance upon time limitations for prosecution of the claim."

*Id.* 53 N.J. at 327, 250 A.2d at 588.

Quoting from *Bollinger v. National Fire Ins. Co.*, 25 Cal.2d 399, 405, 154 P.2d 399, 403 (1944), the *Bowler* court continued, stating,

" 'The insurance policy incorporated by reference in the complaint is of the usual complexity. While courts are diligent to protect insurance companies from fraudulent claims and to enforce all regulations necessary to their protection, it must not be forgotten that the primary function of insurance is to insure. When claims are honestly made care should be taken to prevent technical forfeitures such as would ensue from an unreasonable enforcement of a rule of procedure unrelated to the merits.' "

*Id.* 53 N.J. at 331, 250 A.2d at 589–590.

Having concluded that the insurer violated its duty to disclose to the insured that his claim was about to be barred by the statute of limitations, the *Bowler* court refused to apply the statute as a bar to the claim.

Thus, the reasonable expectations of the insured clearly became the important consideration once the courts had decided that normal contract principles were no longer applicable in insurance transactions. As recognized in *Smith v. Westland, supra,* 15 Cal.3d 111, 123 Cal.Rptr. 649, 539 P.2d 433 (1975), citing *Ransom v. Penn Mutual, supra,* 43 Cal.2d 420, 274 P.2d 633 (1975):

". . . an ordinary person who pays the premium at the time he applies for insurance is justified in assuming that payment will bring immediate protection, regardless of whether or not the insurer ultimately decides to accept the risk."

Recognition of the reasonable expectations of the insured forms the basis of the New Jersey court's decision in *Allen v. Metropolitan Life Ins. Co., supra,* 44 N.J. 294, 208 A.2d 638 (1965):

"Although he knew that his application might ultimately be rejected, he undoubtedly assumed there was interim coverage in the event he died, for that was the very reason he had paid the $576.42 in advance. Indeed, if he was not so covered what justification could the company fairly advance for having taken that large sum from him; surely not the insubstantial collateral advantages which it now asserts or the protection against accidental death which he could have purchased separately for a relatively insignificant amount."

*Id.* 44 N.J. at 306, 208 A.2d at 645.

The *Allen* court further stated,

"In *Metropolitan Life Insurance Company v. Grant* [268 F.2d 307 (9 Cir. 1959)], the court applied *Ransom [v. Penn Mutual Life Ins. Co.]* to a case in which the applicant had paid his premium in advance under an application provision that if it 'is approved at the Company's Home Office for the class, plan, and amount of insurance herein applied for, then the insurance in accordance with the terms of the policy applied for shall be in force from the date hereof.' A medical examination was to be made but the applicant died accidentally before the date scheduled for the examination. The company rejected the application and refused payment contending that *under the language here, which differed from that in Ransom, there was no interim coverage.* This contention was rejected by the Court of Appeals for the Ninth Circuit *which pointed out that Ransom did not turn on language niceties but on the view that where the company has taken the premium in advance while using language calculated to induce such payment, it should not be permitted to escape the obligation which the ordinary applicant would reasonably believe had been undertaken by the insurer."* (Emphasis added.)

*Id.* 44 N.J. at 308, 208 A.2d at 646.

Furthermore, conditional receipts, such as was used in the instant case, tend to encourage deception. As stated by the court in *Toevs v. Western Farm Bureau Life Ins. Co., supra,* 94 Idaho 151, 154, 483 P.2d 682, 685 (1971),

> "We do not mean to imply affirmative misconduct by the soliciting insurance agent. We suggest only that if nothing is said about the complicated and legalistic phrasing of the receipt, and the agent accepts an application for insurance together with the first premium payment, the applicant has reason to believe that he is insured. Otherwise, he is deceived."

*See also Prudential Ins. Co. of America v. Lamme,* 83 Nev. 146, 425 P.2d 348 (1967).

Similarly, in *Smith v. Westland Life Ins. Co., supra,* the court said,

> ". . . our decision . . . is fortified by the consideration recognized in *Ransom [v. Penn Mutual Life Ins. Co., supra]* that it is unconscionable for an insurance company to hold premiums without providing coverage.
>
> . . . . .
>
> Payment of the premium causes the applicant to believe he is immediately covered and hence reduces the likelihood that he withdraw the application during the period of investigation." (Citations omitted.)
> "Furthermore if the company accepts the application and issues a permanent policy, it is thereby able to earn premiums from the earliest date possible. In any event the company has the use of the money during the period of investigation." (Citations omitted.)

123 Cal.Rptr. at 659, 539 P.2d at 443.

The unconscionable result of allowing an insurer to refuse to provide the insurance coverage for which it had been paid on the basis of its claim that a "prompt notice" clause contained in the policy was breached, played also a significant part in our recent decision in *Brakeman v. Potomac Ins. Co.,* 472 Pa. 66, 371 A.2d 193 (1977). Quoting from *Cooper v.*

*Government Employees Ins. Co.,* 51 N.J. 86, 93–94, 237 A.2d 870, 873–874 (1968), we said:

> "[A]lthough the policy may speak of the notice provision in terms of 'condition precedent,' . . . nonetheless what is involved is a forfeiture, for the carrier seeks, on account of a breach of that provision, to deny the insured the very thing paid for. This is not to belittle the need for notice of an accident, but rather to put the subject in perspective. Thus viewed, it becomes unreasonable to read the provision unrealistically or to find that the carrier may forfeit the coverage, even though there is no likelihood that it was prejudiced by the breach. To do so would be unfair to insureds."

*Id.* 472 Pa. at 74, 371 A.2d at 197.

Because the insurer is in the business of writing insurance agreements, the recent trend in insurance cases has been away from strict contractual approaches towards a view that insurance policies (and other insurance contracts) are no longer private contracts in the traditional sense (if they ever were). The traditional contractual approach fails to consider the true nature of the relationship between the insurer and its insureds. Only through the recognition that insurance contracts are not freely negotiated agreements entered into by parties of equal status; only by acknowledging that the conditions of an insurance contract are for the most part dictated by the insurance companies and that the insured cannot "bargain" over anything more than the monetary amount of coverage purchased, does our analysis approach the realities of an insurance transaction. See *Brakeman v. Potomac Ins. Co.,* 472 Pa. 66, 371 A.2d 193 (1977).

We believe that the proper resolution of questions such as that presented by the instant appeal depends upon an analysis of the totality of the transaction involved. It is not enough simply to say that a contract for temporary insurance coverage is subject to the same rules of interpretation as any other insurance contract. To be sure, any ambiguity in the written words will be construed liberally in favor of the insured and against the insurer, *e. g., Burne v.*

*Franklin Life Ins. Co.,* 451 Pa. 218, 226–27, 301 A.2d 799, 804 (1973), and if the language of the application and conditional receipt, when so read, indicates an intent on the part of the insurer to provide interim insurance, then such benefits will be awarded by the court. That, however, is not the end of the examination. In situations where the circumstances of the transaction do not indicate that the insurer intended to provide interim insurance, but nevertheless show that the insurer accepted payment of the first premium at the time it took the application, it is then up to the insurer to establish by clear and convincing evidence that the consumer had no reasonable basis for believing that he or she was purchasing immediate insurance coverage.

■ The reasonable expectation of the insured is the focal point of the insurance transaction involved here. *E. g., Beckham v. Travelers Ins. Co.,* 424 Pa. 107, 117–18, 225 A.2d 532, 537 (1967). Courts should be concerned with assuring that the insurance purchasing public's reasonable expectations are fulfilled. Thus, regardless of the ambiguity, or lack thereof, inherent in a given set of insurance documents (whether they be applications, conditional receipts, riders, policies, or whatever), the public has a right to expect that they will receive something of comparable value in return for the premium paid. Courts should also keep alert to the fact that the expectations of the insured are in large measure created by the insurance industry itself. Through the use of lengthy, complex, and cumbersomely written applications, conditional receipts, riders, and policies, to name just a few, the insurance industry forces the insurance consumer to rely upon the oral representations of the insurance agent. Such representations may or may not accurately reflect the contents of the written document and therefore the insurer is often in a position to reap the benefit of the insured's lack of understanding of the transaction. As stated by the New Jersey Supreme Court in *Allen v. Metropolitan Life Ins. Co., supra,* 44 N.J. 294, 302, 208 A.2d 638, 642 (1965):

"Much of the difficulty may be laid at the doorstep of the life insurance industry itself for, despite repeated

cautions from the courts, it has persisted in using language which is obscure to the layman and in tolerating agency practices which are calculated to lead the layman to believe that he has coverage beyond that which may be called for by a literal reading. The reports are replete with instances where company agents, as here, obtained payment of the full annual premium in advance on the broad representation that there would be interim coverage pending the company's investigation of the application and its action thereon."

Courts must examine the dynamics of the insurance transaction to ascertain what are the reasonable expectations of the consumer. *See, e. g., Rempel v. Nationwide Ins. Co.,* 471 Pa. 404, 370 A.2d 366 (1977). Courts must also keep in mind the obvious advantages gained by the insurer when the premium is paid at the time of application. An insurer should not be permitted to enjoy such benefits without giving comparable benefit in return to the insured.

Turning then to the factual circumstances surrounding the instant appeal, we hold that the insurer has failed to establish by clear and convincing evidence that appellant's husband could not have entertained a reasonable expectation that appellee was obligating itself to provide insurance coverage beginning with appellee's acceptance of the first premium payment. Appellee has argued that the language of the "conditional receipt" gave notice to appellant's husband that no insurance was to take effect until successful completion of the required medical examination. (The receipt is attached as an appendix to this decision). The conclusion we reach here is not determined by the language of the conditional receipt, but by the dynamics of the transaction viewed in its entirety.

In the instant situation, appellant's husband could reasonably have believed that the "conditional receipt" was what it purported to be; i. e., a receipt given to evidence that he had paid the first two months premium. Placement on a "receipt" of contract terms and conditions is not a procedure calculated to inform the customer of the content of those

terms and conditions, but rather, tends to lull the customer into a failure to observe them. To the ordinary consumer, a receipt is considered only to be evidence that money has been paid as part of the insurance purchasing transaction, and as such is often not taken note of when signed by a trusted advisor in the presence of the consumer. At best, the consumer may possibly glance at the receipt to ascertain that the correct dollar amount has been entered on the blank space provided or that the document is signed by the person receiving the money. Frequently, the customer is given such a receipt while still engaged in conversation with the agent, and always, the receipt is given after, or simultaneously with, payment of the initial premium. Any conditions which the insurer has placed within the body of the receipt are therefore irrelevant to the transaction that has already been completed. The payment of money does not indicate a continuation of contract negotiations, but rather their completion. The payment marks the beginning of performance, which generally occurs after the contract has been entered into. At that point, the consumer is put in a position, of either accepting the receipt as a receipt and nothing more, or put in a position in which he must ask the insurance agent to remain silent so that he, the consumer, might have an opportunity to read and study the document. Furthermore, the consumer might be reluctant to read the document aware that such conduct might imply a mistrust of the person with whom he has already made an agreement, generally after lengthy and personal discussions.

Appellee also contends that their agent informed appellant's husband that a medical examination was necessary. Appellee has not established by clear and convincing evidence, however, that their agent told the decedent that he was paying money upon application for insurance coverage that would not begin until successful completion of the medical examination. The fact that he informed appellant's husband that a medical examination was required by the insurer does not affect our conclusion therefore.

An often stated objection to construing a "conditional receipt" so as to create interim or temporary insurance is that affording such present insurance coverage may allow one who is in fact an uninsurable risk to secure coverage for as long a period of time as it takes the insurer to discover that the applicant is not an acceptable risk. Citing *Prudential Ins. Co. of America v. Lamme, supra,* 83 Nev. 146, 425 P.2d 346 (1967), the court in *Damm v. National Ins. Co. of America,* 200 N.W.2d 616 (N.D.1972) dismissed this objection stating that insurance companies have a choice either to accept the risk sometimes involved in the use of conditional receipts, or the insurance company could forego the advantages derived from the customer's payment of a premium deposit upon application, and write "C.O.D." insurance. The court in *Prudential, supra,* explained "C.O.D." insurance as follows:

> "Absent a contrary agreement (the conditional receipt, for example) payment of the initial premium and delivery of the policy are usually concurrent acts, thereby creating a period between the signing of the application by the applicant and the delivery of the policy during which no money has been advanced to the insurance company, and no insurance is in effect. This is called 'COD', or 'cash on delivery' insurance.
>
> *Prudential Ins. Co. of America v. Lamme, supra,* Footnote 4, 425 P.2d at 348."
>
> (As quoted in *Damm v. National Ins. Co. of America, supra,* 200 N.W.2d at 620.)

■ The insurance industry is regulated by the Commonwealth in order to provide protection to the insurance buying public. See "The Insurance Department Act of 1921," Act of May 17, 1921, P.L. 789, art. I, § 102 (40 P.S. § 1 et seq.), and "The Insurance Company Law of 1921," Act of May 17, 1921, P.L. 682, § 102 (40 P.S. § 341 et seq.). If insurers wish to protect themselves from liability during the interim period between the taking of the application and approval (or between the application and successful completion of a required medical examination), all that need be

done is to delay acceptance of the applicant's money until that time. If, on the other hand, the insurer wishes to enjoy the substantial benefits it receives by securing the customer's cash at the time of the taking of the application, it must return what the customer can reasonably expect that the insurer is selling: i. e., immediate coverage. Alternatively, the insurer could inform the prospective applicant, *before any money changes hands,* that it does not intend to give the customer anything in return for advance payment, and that the customer is actually paying money now for nothing because no insurance will take effect until approval. Such notification would have to be given *before* the consumer paid the initial premium in order to avoid placing that consumer at the psychological disadvantage of having to ask for a return of the premium if he or she is dissatisfied with such terms. Furthermore, any such notice must be made in a manner calculated to bring the facts of the transaction— that the customer is paying money now, but getting nothing until later—to the customer's attention in no uncertain terms. As such, the notice could not be printed on a receipt.

█ Only after such an unequivocal showing that the consumer is to be given no immediate benefits in return for his or her cash payment can a court say that the insurer has sustained its burden of establishing by clear and convincing evidence that the consumer could not reasonably have expected to receive immediate coverage in return for the payment of the required premium. The insurer has failed to show this here, and we therefore vacate the order of the Superior Court, reverse the order of the trial court, and remand the matter to the trial court with instructions that it enter an order in favor of appellant.

JONES, former C. J., did not participate in the consideration or decision of this case.

POMEROY, J., filed a dissenting opinion.

# APPENDIX TO OPINION

## FRONT

This receipt must not be detached unless settlement of the first full premium has been made by the Applicant at the time of application and such premium amount meets the Company's minimum Premium rules.

**CONDITIONAL FIRST LIFE PREMIUM RECEIPT: NO INSURANCE WILL BECOME EFFECTIVE PRIOR TO POLICY DELIVERY UNLESS THE ACTS REQUIRED BY THIS RECEIPT ARE COMPLETED. NO AGENT OF THE COMPANY IS AUTHORIZED TO CHANGE ANY ACT REQUIRED.**

**N⍛ 308531**  Received from _____ this_____ day of _____ _____, 19_____, the sum of ____ _____ _____ Dollars ($ _____) in connection with

an application for Life insurance in NATIONWIDE LIFE INSURANCE COMPANY, Columbus, Ohio, which application bears the same date and printed number as this receipt

If the sum indicated above equals the first full premium on the premium payment basis selected in the application for the insurance applied for and if the following acts are completed, (a) receipt by the Company of a fully completed application which includes fully completed medical examinations, if any required by the Company's published underwriting rules because of the age of the Insured or the amount of insurance applied for and (b) completion of all investigation by the Company and the Company is satisfied that the Proposed Insured and (without prejudice to the Proposed Insured) each person proposed for coverage under the Family Rider or the Children's Rider (whichever is applicable and if applied for) is insurable and qualified under the Company's published rules, limits and standards on the plan and for the amount applied for and at the premium specified herein, the said insurance shall take effect and be in force subject to the provisions of the policy applied for from the date of the last medical examination, or if no medical examination is required, the insurance shall take effect on the application date Unless all acts required are completed, no insurance shall take effect hereunder

In any event, the amount of insurance becoming effective under the terms of this receipt is hereby limited to the extent that in the event of the death of the Proposed Insured the total liability of the Company shall not exceed $100,000 said amount to include any life insurance then in force with the Company and any benefits payable by the Company as a result of accidental death

If the application is declined the amount evidenced by this receipt shall be refunded

(Agent must sign here) ___ __ _ __ __ _____ _____ __ ____ __ Agent

NOTICE· This receipt is not valid for any premium for the insurance applied for except the first full premium thereon which in no event shall exceed one annual premium for such insurance together with the premium for interim term insurance, if any

## REVERSE

### IMPORTANT

The Company reserves the right to require a medical examination. Until you can provide proof that you are insurable, the Company provides no insurance.

If you are requested to have an examination, don't delay. Make arrangements promptly. There is no insurance until a satisfactory medical examination has been made and all the conditions of this receipt are completed.

POMEROY, Justice, dissenting.

I emphatically dissent. Once again the Court, without justification in the facts of the case at hand, ignores the clear and unambiguous language of an insurance contract and dictates a result unsupported by the agreement of the parties.

In so doing the Court begins with a discourse concerning the evils perceived to be inherent in insurance contracts, particularly the practice common among life insurance com-

panies of accepting premium payments before the effective date of coverage (i. e., prior to completion of a required medical examination). Then, following a review of the "totality of the circumstances" in light of the "dynamics of the transaction", the majority, assuming a gratuitous regulatory role over the insurance industry in Pennsylvania,[1] concludes that the "reasonable expectations" of the applicant require a finding that temporary insurance was in effect from the date of signing the application and payment of the premium. Thus the problem in deciding an insurance claim seems no longer to be one of ascertaining what the contract as written means, but of somehow divining the "reasonable expectation" of the insured as to what the contract should mean.

1. There are legitimate reasons for requiring payment of premiums in advance of coverage attaching. As Professor Williston has observed:

"During the period when the applicant's offer (application) is outstanding and unaccepted by the company, the offeror (applicant) has the power to revoke his offer. Should he do so, the company not only loses its expected underwriting profit but is also out the cost of the medical examination and related expenses of securing and processing the application. Such costs are particularly burdensome where a considerable volume of the company's business consists of applications for policies in small dollar amounts." IX Williston on Contracts, § 902A, at 197–199 (3rd ed. 1963).

I am of the opinion that this Court has neither the responsibility nor the expertise to balance such considerations with those conflicting considerations favoring coverage of an applicant pending approval of the application. The General Assembly has properly seen fit to establish an Insurance Department to oversee the operation of insurance companies in this state. See the Insurance Company Law of 1921, Act of May 17, 1921, P.L. 789, § 1, 40 P.S. § 1, et seq. Accordingly, I agree with the rationale of the Wisconsin Supreme Court which, when faced with a similar contract, concluded:

"It is not within the province of this court to determine what coverage, in its good conscience, the life insurance industry should be required to offer. . . . That function [the regulation of insurance companies] is vested by the legislature in the office of the Commissioner of Insurance. We do not have the power to create a new contract for the parties. Thus, while we may not approve of such a sales device as a conditional receipt and would like to see interim insurance afforded, we are powerless to so legislate." Brown v. Equitable Life Ins. Co. of Iowa, 60 Wis.2d 620, 630, 211 N.W.2d 431, 436 (1973).

Initially, it is important to note that we are not here dealing with a lengthy and complex document which is arguably incomprehensible to the average layman. Rather, we are dealing with a short and explicit form of premium receipt presented and explained to the applicant when he signed the application and made a payment on account of initial premium. As will be noted from the text of the receipt attached to the majority opinion, the top line of the paper declares in capital 12-point letters that "NO INSURANCE WILL BECOME EFFECTIVE PRIOR TO POLICY DELIVERY UNLESS THE ACTS REQUIRED BY THIS RECEIPT ARE COMPLETED." The main text of the receipt, in 10-point type, then details the two steps to be completed, and plainly states that the insurance "shall take effect and be in force . . . from the date of the last medical examination" from which insurability is determined. This is followed by the warning that "Unless all acts required are completed, no insurance shall take effect hereunder." On the reverse side of the receipt form, under the heading "IMPORTANT" appears a final admonition to the application. It is in 14-point type, repeated here for the sake of completeness:

"The Company reserves the right to require a medical examination. Until you can provide proof that you are insurable, the Company provides no insurance.

"If you are requested to have an examination, don't delay. Make arrangements promptly. There is no insurance until a satisfactory medical examination has been made and all the conditions of this receipt are completed."

There is no dispute that the applicant in this case, the plaintiff's husband, was advised by the agent and knew that he had to take a physical examination. (R. 12a, 34a). He was also told that there would be no coverage until the physical examination had been approved at the home office of the company. (R. 38a). But all this language of the receipt, says the Court, and the fact that this applicant was given an oral rendering of its provisions, is unimportant and irrelevant; the applicant is not obliged to read the receipt,

and its language has nothing to do with the case. The outcome is not determined by the language of the agreement, whether read or not, but by "the dynamics of the transaction viewed in its entirety." Opinion of the Court, *ante* at 1354.

A dozen years ago this Court declined to hold that under the particular contract then before it, the taking of a medical examination was a precondition to coverage. We stated flatly that "[i]f the insurance company had wished to make the taking of the medical examination a condition precedent to the contract, it should have said so with explicit language." *Steelnack v. Knights Life Insurance Co. of America*, 423 Pa. 205, 208, 223 A.2d 734, 735 (1966). As I see it, the insurance company in the case at bar has carefully heeded that admonition, but to no avail.[2] Ignoring the carefully explicit and unambiguous language of the receipt here involved, the Court concludes that Francis Collister, the applicant, was covered despite his failure to obtain a medical examination.

The Court's decision is contrary to the clear weight of authority elsewhere.[3] While reliance is placed on a number

**2.** Indeed, only last year Mr. Justice MANDERINO, writing for himself and two other members of the Court, emphasized the importance of clarity of language in an application form:

"The application form . . . could be prepared in large type *in terms easily understood by the insured* so that reliance on the agent's representations would not be necessary. The insurance company might adopt a practice whereby an insured is required to sign the policy and acknowledge the receipt of a clear and comprehensible notice of at least the main coverage provided either as contained in the policy document or separately. These examples only serve to illustrate why we are not persuaded that the insurance company is helpless to avoid or severely limit the possibility of fraudulent claims. We have very little sympathy for Nationwide's alleged concerns in view of the fact that its procedures necessitate reliance by a consumer on the representations of the insurance agent." *Rempel v. Nationwide Life Insurance Co.*, 471 Pa. 404, 412, 370 A.2d 366, 369–370 (1977).

**3.** *See*, e. g., *Machinery Center, Inc. v. Anchor Nat. Life Ins. Co.*, 434 F.2d 1 (10th Cir. 1970); *Scheinman v. Phoenix Mutual Life Ins. Co.*, 409 F.2d 999 (7th Cir. 1969); *Cortez v. Life Ins. Co.*, 408 F.2d 500 (8th Cir. 1969); *Thompson v. Occidental Life Ins. Co. of Cal.*, 90 N.M. 620, 567 P.2d 62 (1977); *Brown v. Equitable Life Ins. Co. of Iowa*, 60

of recent cases in other jurisdictions, examination of the cited opinions reveals that without exception those cases were concerned with complicated and ambiguous legal terminology. The following excerpts will illustrate the point: "While some of the language tends to support the company's position, it does no more than produce an ambiguity, and the ambiguity must be resolved against defendant [insurance company]." *Ransom v. Penn Mutual Life Ins. Co.*, 43 Cal.2d 420, 274 P.2d 633, 636 (1954); "They [insurance companies] have nevertheless failed to clarify the language used in such receipts so as to eliminate patent ambiguities . . .", *Smith v. Westland Life Ins. Co.*, 15 Cal.3d 111, 121, 123 Cal.Rptr. 649, 656, 539 P.2d 433, 440 (1975); "Thus the provisions of the contract . . . were confusing and ambiguous . . . [t]he contract is to be construed in favor of the insured." *Toevs v. Western Farm Bureau Life Ins. Co.*, 94 Idaho 151, 153, 483 P.2d 682, 684 (1971); ". . . and, if there is an ambiguity involved, it will be decided in favor of the insured." *Turner v. Worth Ins. Co.*, 106 Ariz. 132, 134, 472 P.2d 1, 3 (1970); ". . . if nothing is said about the complicated and legalistic phrasing of the receipt . . . the applicant has reason to believe that he is insured." *Prudential Life Ins. Co. of America v. Lamme*, 83 Nev. 146, 149, 425 P.2d 346, 348 (1967); "Thus we have consistently construed policy terms strictly against the insurer and where several interpretations are permissible, we have chosen the one most favorable to the assured." *Allen*

Wis.2d 620, 211 N.W.2d 431 (1973); *United States Ins. Co. of America v. Collins*, (D.C.App.1973), 305 A.2d 527; *Fabrizio v. Fidelity & Guaranty Ins. Co.*, 27 Utah 2d 248, 494 P.2d 953 (1972); *Borer v. Security Indus. Life Ins. Co.*, (La.App.1971), 245 So.2d 5, writ refused, 258 La. 575, 247 So.2d 394 (1971); *Cannon v. Southland Life Ins. Co.*, 263 Md. 463, 283 A.2d 404 (1971); *Adams v. State Capital Life Ins. Co.*, 11 N.C.App. 678, 182 S.E.2d 250 (1971); *Cavello v. Metropolitan Life Ins. Co.*, 312 N.Y.S.2d 438, 34 A.D.2d 682 (1970); *Elliott v. Interstate Life & Acc. Ins. Co.*, 211 Va. 240, 176 S.E.2d 314 (1970); *Employers Protective Life Assur. Co. v. Gatlin*, 246 Ark. 244, 437 S.W.2d 811 (1969); *Marshall v. Bankers Life & Cas. Co.*, (Tex.Civ. App.1968), 425 S.W.2d 45; *Woodmen of World Life Ins. Soc. v. Etheridge*, 223 Ga. 231, 154 S.E.2d 369 (1967); *Morgan v. State Farm Life Ins. Co.*, 240 Or. 113, 400 P.2d 223 (1965); *Adolf v. Union N. L. Ins. Co.*, 170 Neb. 38, 101 N.W.2d 504 (1960).

*v. Metropolitan Life Ins. Co.*, 44 N.J. 294, 305, 208 A.2d 638, 644 (1965); ". . . particularly where the language expressing the extent of the coverage may be deceptive to the ordinary layman . . . ." *Bowler v. Fidelity and Casualty Co. of N. Y.*, 53 N.J. 313, 327, 250 A.2d 580, 587 (1969). *Accord: McAvoy Vitrified Brick Co. v. North American Life Assurance Co.*, 395 Pa. 75, 149 A.2d 42 (1959).

I have no quarrel with this line of authority, for I am in complete agreement with the general proposition that insurance contracts should be interpreted strictly against the drafters and that the ambiguities with which such contracts are frequently replete must be resolved in favor of the insureds. But in the simple, brief document now before us, there is simply no ambiguity or confusingly technical or convoluted phraseology. It is not the function of a court to rewrite express and unambiguous terms in a contract to comport with what that court might deem a fairer result in a particular situation. See Corbin on Contracts, § 559, p. 268 (1960). This presumably elementary aspect of the law of contracts is not changed because the contract pertains to insurance. *See*, e. g., *Penn-Air, Inc. v. Indemnity Insurance Company of North America*, 439 Pa. 511, 517, 269 A.2d 19, 22 (1970). Thus a leading authority on insurance law applies it to receipts such as the one before us:

"In accordance with the general rule of construction, a binding receipt which is ambiguous is to be construed in favor of the insured. Any doubt as to whether a binder receipt issued for the initial premium pending an application for a life insurance policy operates to put the insurance into immediate effect must be resolved against the insurer.

"The rule of construction of a binding receipt in favor of the insured applies only when there is in fact an ambiguity to be interpreted. In accordance with the general rule of construction, the court is not authorized to rewrite the terms of a binder which is clear." 1 Couch on Insurance 2d, § 14:36, at 616 (1959) (footnotes omitted).

Couch's statement represents the general rule, acknowledged in Pennsylvania as elsewhere: [4]

"There are numerous cases that read similarly worded conditions in binders as subsequent and find temporary coverage regardless of insurability. *See, e. g., Wood v. Metropolitan Life Ins. Co.,* 302 F.2d 802 (9th Cir. 1962) (applying *Ransom v. Penn Mutual Life Ins. Co.,* 43 Cal.2d 420, 274 P.2d 633 (1954)); *Metropolitan Life Ins. Co. v. Grant,* 268 F.2d 307 (9th Cir. 1959); *Iwai v. Hawaiian Life Ins. Co.,* 51 Haw. 288, 459 P.2d 195 (1969); *Allen v. Metropolitan Life Ins. Co.,* 44 N.J. 294, 208 A.2d 638 (1965); *Prudential Ins. Co. v. Lamme,* 83 Nev. 146, 425 P.2d 346 (1967). Some of the holdings turn on ambiguities in the language of the binders. It is a universal rule of construction that ambiguities are to be resolved against the insurer. *Mutual Life Ins. Co. v. Hurni Packing Co.,* 263 U.S. 167, 44 S.Ct. 90, 68 L.Ed. 235 (1923). In the present case, however, there are no ambiguities in the binder, and we cannot read any into it." *Thomas v. Chesapeake Life Ins. Co.,* 226 Pa.Super. 366, 367, 313 A.2d 332, 335 (1973).

Because no ambiguities existed in the receipt in the case at bar, the majority errs in reaching a result contrary to the obvious intent of the agreement.[5]

4. *See* e. g., *Scheinmann v. Phoenix Mutual Life Ins. Co.,* 449 F.2d 999 (7th Cir. 1969); *Cortex v. Life Ins. Co.,* 408 F.2d 500 (8th Cir. 1969); *Taylor v. New York Life Ins. Co.,* 324 F.2d 768 (10th Cir. 1963); *Essex County State Bank v. Fireman's Fund Ins. Co.,* 331 F.Supp. 931 (D.N.J.1971). *Thompson v. Occidental Life Ins. Co. of Cal.,* 90 N.J. 620, 567 P.2d 62 (1977); *Brown v. Equitable Life Ins. Co. of Iowa,* 60 Wis.2d 620, 211 N.W.2d 431; *Adolf v. Union N. L. Ins. Co.,* 170 Neb. 38, 101 N.W.2d 504 (1960).

5. By the same token, it is improper for a court to purport to find an ambiguity where none exists and then to apply the rule of construction which resolves ambiguities against the drafter of the document. As the Supreme Court of Oregon succinctly stated in *Morgan v. State Farm Life Ins. Co.,* 240 Or. 113, 400 P.2d 223 (1965):

"Admittedly, there have been cases in which a theory of constructive ambiguity has been employed in the absence of any ambiguity. [citations omitted]. Nevertheless, we are unable to decide the case at bar on the basis of a fiction which we deem inapplicable. The literal meaning of the receipt in this case is that

One of the means used by the majority to justify the result reached in this case is to characterize an insurance contract as "adhesive". As I understand it, a "contract of adhesion" is one where the superior bargaining power of one party denies to the other party any opportunity to bargain in a meaningful way over terms and conditions of the contract. *See generally* Restatement (Second) of Contracts §§ 231–237 (Tent. Draft No. 5, 1971). In the case before us, however, the majority acknowledges the general availability of "C.O.D." insurance, from which it appears that the present applicant was free to demand immediate coverage or to patronize another insurance company. Thus the "adhesive" quality which is often present was not in fact an element in the situation before us. The fact that the receipt form, like the application, was a standard form contract does not in and of itself make the arrangement adhesive.[6]

Even if the contract before us could properly be characterized an adhesion contract, that is not an end of the matter;

> the insurer engaged to insure the insured, if he turned out to be insurable, and, in that event, the insurance would be in effect from the date of application. Such contracts have not been declared to be illegal in this state. Accordingly, this is the contract the parties made, and we are not at liberty to create a new contract for the parties." 240 Or. at 116–17, 400 P.2d at 224–25.

**6.** Insurance contracts are only one type of standard form contracts which have become pervasive in recent years. This phenomenon is thus described by Professor Slawson:

> "Standard form contracts probably account for more than ninety-nine percent of all the contracts now made. Most persons have difficulty remembering the last time they contracted other than by standard form; except for casual oral agreements, they probably never have. But if they are active, they contract by standard form several times a day. Parking lot and theater tickets, package receipts, department store charge slips, and gas station credit card purchase slips are all standard form contracts.
>
> "Moreover, standard forms have come to dominate more than just routine transactions. For individuals, if not quite yet for corporations, form contracts are in common use for even such important matters as insurance, leases, deeds, mortgages, automobile purchases, and all of the various forms of consumer credit. The contracting still imagined by courts and law teachers as typical, in which both parties participate in choosing the language of their entire agreement, is no longer of much more than historical importance." W. Slawson, Standard Form Contracts and Democratic Control of Lawmaking Power, 84 Harv.L.R. 529 (1971).

there is still an agreement in effect between the parties and a court must determine the extent, if any, to which it will be enforced. The idea that an adhesion contract may be wholly or in part unenforceable is one to be implemented with restraint, for it involves a judicial determination of public policy; it is not meant to be a device which enables a court to randomly impose its sense of justice on a market place dependent on supply and demand in arriving at contractual terms.

As I understand its opinion, the majority does not purport to base its refusal to enforce the terms of the receipt solely on the ground of its alleged adhesive quality. Rather, the fact that an insurance contract is said to be adhesive in nature is used to reach the startling conclusion that "the insured is under no duty to read the policy," Opinion of the Court, *ante* at 1351. A consequence of this, in turn, is that what governs the rights and duties of the parties *inter se* are not the provisions of the document as written, but "the reasonable expectations of the insured," *id.* at 1352; that becomes "the important consideration" *id.*, "the focal point of the insurance transaction," *id.* at 1353. Thus courts are adjured to examine the "dynamics" of that transaction to ascertain the reasonable expectation of the applicant. "The conclusion we reach here is not determined by the language of the conditional receipt, but by the dynamics of the transaction viewed in its entirety." Opinion of the Court, *ante* at 1354. Those dynamics are then found to be that the applicant "could reasonably have believed" that the receipt "was what it purported to be, viz., evidence of payment of the first two months premium, and nothing more." We are left to infer the consequence that the applicant reasonably expected that he was obtaining immediate coverage.

I must confess that the strained argument of the majority strikes me as a complete tour de force. While the doctrine of "reasonable expectations" has found acceptance and indeed has validity in some situations in insurance litigation, it

has no place in the case at bar. The idea of recognizing "reasonable expectations" of an applicant or an insured does not mean that a claimant on a policy is entitled to every benefit imaginable within a contractual framework. Rather, the approach is an equitable one, meant to guard against the use of complex and confusing qualifications and exceptions by insurers to defeat the reasonable expectations of the average layman entering into an insurance transaction. See R. Keeton, *Insurance Law Rights at Variance with Policy Provisions*, 83 Harv.L.R. 961 (1970). But, as Professor Keeton has noted:

"Thus, not only should a policyholder's reasonable expectations be honored in the face of difficult and technical language, but those expectations should prevail as well when the language of an unusual provision is clearly understandable, unless the insurer can show that the policyholder's failure to read such language was unreasonable.

"It is important to note, however, that the principle of honoring reasonable expectations does not deny the insurer the opportunity to make an explicit qualification effective by calling it to the attention of a policyholder at the time of contracting, thereby negating surprise to him." R. Keeton, *supra* 83 Harv.L.R. at 968.

Here, contrary to the assertions of the majority, the applicant was informed both that a physical examination was necessary and that the physical examination as well as approval by the home office were prerequisites to coverage. Thus, any expectations to the contrary could hardly be deemed reasonable.

In sum, in the insurance dispute at bar, there is nothing whatever to suggest any fraud, deception or overreaching on the part of Nationwide, and nothing to support the position that the applicant could reasonably have entertained any expectations other than those which the receipt unambiguously set forth. I would affirm the order of the courts below.