186 N.J. Super. 296 (1981)
452 A.2d 667
WILFRED TANTUM, PLAINTIFF-APPELLANT,
v.
CHARLES D. BINZ, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 10, 1981.
Decided May 13, 1981.
*297 Before Judges BOTTER, KING and McELROY.
Laurence M. McHeffey argued the cause for appellant (Hanlon, Dempsey & McHeffey, attorneys).
Hugh Porter argued the cause for respondent (Enright, Porter & Lenney, attorneys; Michael P. McGrath, on the brief).
The opinion of the court was delivered by KING, J.A.D.
On July 22, 1977 plaintiff filed suit for personal injuries arising from a March 31, 1975 automobile accident. Defendant pleaded the two-year statute of limitations in bar. N.J.S.A. 2A:14-2. Plaintiff rejoined, claiming that defendant was equitably estopped to plead the bar of the statute.
*298 Upon defendant's request a nonjury evidentiary hearing was held before trial by Judge McGann limited to the propriety of defendant's plea of the statute of limitations as a valid defense to the action. We conclude that this was a proper approach to the essentially equitable statute of limitations issue. See Lopez v. Swyer, 62 N.J. 267 (1973); see, also, Fitzgerald v. Wright, 155 N.J. Super. 494 (App.Div. 1978).
After hearing the evidence Judge McGann concluded that equitable considerations did not obviate the defense plea that the statute had run and he dismissed the action. He concluded that defendant's agent did not intentionally lull plaintiff into sleeping on his rights. Plaintiff appeals, contending, in essence, that no reasonable view of the evidence supports the result reached. We disagree and affirm for the reasons expressed in Judge McGann's factual analysis of the proofs presented to him. While these proofs were susceptible of conflicting interpretation, his view of the facts after seeing and hearing the witnesses finds support in the record. We therefore must affirm. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-484 (1974). Unless we have "a definite conviction that the judge went so wide of the mark, a mistake must have been made," we are duty bound to accept his factual findings. State v. Johnson, 42 N.J. 146, 162 (1964).
The trial judge found plaintiff to be "an intelligent individual, well-oriented, self-possessed, able to do things well ... There is no sense at all of incompetency involved in the case." The judge found as a fact that Lang, the independent adjuster for defendant's automobile liability carrier, who exclusively dealt with plaintiff and his mother, "never in any way told the Tantums to sue, never said don't sue, wait, wait, don't do anything, hold off. There was nothing like that." Indeed, the statute of limitations was not discussed at all by the parties. The judge further found that "in no way did Mr. Lang ever try to discourage Mr. Tantum from going to a lawyer." The judge accepted Lang's credibility when he concluded: *299 "[W]hen he says I [Lang] in no way mentioned settlement, I find that the probability is that this is so, that he did not mention settlement."
The carrier and Lang, Judge McGann found, consistently viewed this as a no liability case. "I think he is entitled to that view." The judge found:
That was a realistic view because as I read the statements, the case happened in a very simple way.
Mr. Binz was a friend of Mr. Tantum.
They got in Mr. Binz' car after having a meal at Mrs. Tantum's house.
They started down the road and had gone but a short distance and there was a curve and both agree that when Mr. Binz went around the curve he was doing 20 to 25 miles per hour.
Mr. Tantum was a passenger and as they went around the curve for some reason or other the door on his side opened up and he fell out of the car and was hurt, seriously hurt.
But, if you came to a trial of that and somebody said Mr. Binz is negligent, I think everyone would be left scratching their heads and say, well, what did he do wrong? He didn't close the door for Mr. Tantum when Mr. Tantum got in the car.
Mr. Tantum got in the car and apparently no one suggests that it was a door that had always fallen open.
It simply was an accident that happened and the word accident, I think, by derivation means nobody's fault, a happening that no one is responsible for.
This liability picture supported the judge's conclusion that there never were any negotiations that could have lulled plaintiff into an assurance of payment at the end of the trail.[1] Again, the *300 judge specifically found that "no one ever told them not to go to a lawyer or not to seek legal advice. They ultimately did so, but they did so a little too late. That's what the statute of limitations is all about."
In several letters to his principal, Banner Casualty Insurance Company, Lang made reference to maintaining "control over the claimant." From our analysis of the judge's opinion and the complete record, we conclude that the judge found nothing invidious about this asserted "control." In the letter of February 11, 1977 Lang reported:
If we stay in frequent contact with the claimant we should be able to perceive when the claimant's patience is exhausted and he will seek the services of an Attorney. If this comes to pass, it is my opinion that we should consider tendering a "take it or leave it" settlement offer of $4,000.00 to $4,500.00. It is my opinion that this offer should only be tendered if it becomes apparent that an Attorney will become involved otherwise.
This effort at "control" was not to keep plaintiff away from an attorney but to preserve the opportunity to negotiate a settlement, if the company ever extended any authority, before an attorney was actually engaged. We cannot say that this was an *301 unreasonable interpretation of the evidence on this record where the judge found that Lang "was not bugging, so to speak, the Tantums" and the "contacts between the parties were initiated principally by Mrs. Tantum calling Mr. Lang."
Accepting the factual findings made by Judge McGann, the legal authorities in which plaintiff seeks solace are not persuasive in his favor. In Friedman v. Friendly Ice Cream Co., 133 N.J. Super. 333 (App.Div. 1975), this court held only that plaintiff was entitled to a factual hearing on whether equitable considerations barred the defense of limitation of action. There plaintiff-appellant had shown by affidavit in unsuccessfully resisting summary judgment that a factfinder could find that (a) he had a valid claim, (b) defendants had, in effect, admitted liability, (c) offers had been made, (d) negotiations were intentionally protracted by defendants "so as to have the statute of limitations run against plaintiff's claim" and (e) defendants were guilty of unconscionable conduct. Id. at 337.
In the present case the factfinder has already heard the evidence and found against plaintiff. Cf. Peloso v. Hartford Fire Ins. Co., 56 N.J. 514 (1970) (fire policy), and Bowler v. Fidelity & Cas. Co. of N.Y., 53 N.J. 313 (1969) (accident policy), where the Supreme Court held that equitable considerations entitled first-party claimants to escape the bar where their own carriers acted unconscionably in handling their claims, contrary to "the highest burden of good faith" the carriers owed to their insured defendant. Id. at 327.
Here, plaintiff had a factual hearing and the findings went against him. In the adversarial context presented by a third-party auto claim, the judge found factually that plaintiff was not misled into a tardy assertion of his claim. Rather, the judge found that plaintiff slept on his right to file suit on a very doubtful claim which had never been accepted for payment by the alleged tortfeasor's insurer. The evidence supports the finding.
We affirm.
*302 BOTTER, J.A.D. (dissenting).
It is undisputed that the insurance adjuster, David Lang, succeeded in the task assigned to him by Banner Casualty Company in the directive of May 12, 1975 to "control" the claimant "if possible." Lang at first said that "to control the claimant" meant "trying to control the medical expenses," but he later admitted that it also meant trying "to keep him out of the hands of an attorney."
The accident occurred on March 31, 1975. In conversations with plaintiff or his mother Lang "always asked ... for medical information."[1] Lang attempted "to control" the claimant "by showing my concern for his well being, and that I wasn't the enemy...." Prior to plaintiff's back operation in October 1976, Lang indicated that he couldn't do anything about settling the claim until plaintiff completed his medical treatment. Then plaintiff was scheduled to be examined by Dr. Moore on January 5, 1977. Plaintiff was threatening to go to an attorney if his claim was not met after the physical examination took place. In reporting this communication Lang wrote to the carrier, "Please note that the Statute of Limitations expires on March 31st, 1977." On February 11, 1977 Lang reported further contact with plaintiff's mother, who stated that plaintiff was still seeing a doctor for checkups. The report of the physical examination had not been received as yet. Lang stated further:
We intend to remain in frequent contact with the claimant in order to ascertain his condition and attitude.
In my opinion, we have a good chance to see this claim die a natural death after the Statute of Limitations expires. The claimant has indicated previously that he intends to seek the services of an Attorney if he becomes unsatisfied with our claim handling after his physical examination has taken place. I have informed Mrs. Tantum that we have not yet received the Report and therefore we cannot act on it.

*303 If we stay in frequent contact with the claimant we should be able to perceive when the claimant's patience is exhausted and he will seek the services of an Attorney... [Emphasis supplied.]
Dr. Moore's report was forwarded to the carrier in Lang's letter of February 28, 1977. Dr. Moore reported a permanent injury to plaintiff's back. Medical expenses exceeded $10,000. On March 21, 1977 Lang reported that the statute of limitations would expire in ten days and he was, therefore, "not contacting the claimant...."
It is clear that plaintiff had not become so "unsatisfied" with Lang's "handling" of "the claim" to make good the threat to go to an attorney. While no promise of a settlement may have been made, as the trial judge found, Lang's conduct led plaintiff to assume that the claim would be evaluated in good faith toward the possibility of a settlement after the report of his medical examination was sent to the carrier. Instead, Lang was simply using his "frequent contact" with plaintiff and plaintiff's mother to lull them into the belief that serious negotiations were intended. The process worked. It is inconceivable that plaintiff would not go to a lawyer, as he eventually did, except for the impression created by Lang that real negotiations would commence as soon as his medical status was evaluated. Plaintiff testified that he was told, "I would have to wait until my treatments was through" before there would be settlement negotiations. Lang testified that Mrs. Tantum said they were "in dire financial straits and needed some money." He said "they were desperate for money." Obviously, plaintiff and his mother did not seek the aid of an attorney while they believed negotiations with Lang would be fruitful. But after the statute of limitations had run, Lang no longer had any need to mislead plaintiff. It was then that, according to her testimony, plaintiff's mother was told "to sue the doctors," and that the case would not be settled because the statute of limitations had run out. Although he could not clearly recall what he said after the statute had run, Lang "believed he talked to her [plaintiff's mother] about it." Plaintiff's complaint was filed on July 22, 1977, nearly four months after the statute had run.
*304 Plaintiff is in his forties and lives with his mother. He is described as having a borderline mentally retarded level of intelligence; he left school in the 6th grade at age 16 because he was "nervous." He was hospitalized for six weeks after the accident and did not return to work thereafter.
In my view, Lang's conduct should bar defendant from pleading the statute of limitations. Plaintiff's mother testified that Lang promised to "do a settlement" after medical treatments were ended. This is consistent with their conduct. Even if Lang did not actually promise a settlement, he surely led plaintiff and his mother to believe that the evaluation of the claim was merely awaiting further medical information. Actually, it was not the medical information that would determine whether an offer of settlement would be made. The likelihood of plaintiff going to an attorney or the likelihood of the statute expiring were key factors. If the lack of liability was the determining factor, the claim could have been rejected long before the period to sue had expired. Instead, Lang reassured plaintiff and his mother that he was interested in plaintiff's well-being and needed more medical information. This interest abruptly ended when the statute ran.
The equitable right to relief from the statutory bar should not turn on a technical evaluation of the exact words used by Lang. This was the trial judge's approach to the case. Rather, I find in the uncontroverted evidence clear proof of unconscionable conduct sufficient to preclude the use of the statute of limitations as a bar to plaintiff's claim. Lang clearly misled plaintiff as to his intentions, knowing plaintiff was ignorant of the statute of limitations. Having engendered the confidence and trust placed in him by plaintiff and his mother, I have no difficulty in finding that Lang's failure to warn plaintiff of the consequences of their prolonged negotiations was unconscionable conduct. Howard v. West Jersey and Seashore R.R. Co., 102 N.J. Eq. 517, 522 (Ch. 1928), aff'd 104 N.J. Eq. 201 (E. & A. 1929); see Bowler v. Fidelity & Cas. Co. of N.Y., 53 N.J. 313, 328 (1969).
*305 Bowler involved an insurance company's dealing with its own insured, where the court said the insurer must act with "the highest burden of good faith," and had "the duty to speak and disclose" its liability. 53 N.J. at 327, 328. I would not go so far in this case, where Banner Casualty Company was not dealing with its own insured. But I would not allow Banner to benefit from conduct which lulled plaintiff into inaction. In Howard v. West Jersey and Seashore R.R. Co., supra, the court estopped defendants from interposing the statute of limitations as a defense because plaintiffs' failure to start suit in time was induced by defendants' conduct. Therefore, Dr. Howard did not know of the two-year limitation and awaited defendants' reply to his settlement demand while defendants collected information on Mrs. Howard's medical condition. All along defendants' investigator had expressed "sympathetic concern" for Mrs. Howard's injuries, but plaintiffs were under the impression that a settlement could not be reached until the permanency of the injuries was ascertained. Finally, one or two days before the limitation period expired defendants' claims agent offered $2,500 against a $10,000 demand. After the statute ran plaintiffs were told it was too late to accept the $2,500 offer. In an opinion adopted by the Court of Errors and Appeals, the vice-chancellor said:
Also, it should be noted that while the doctrine of estoppel in pais rests upon the ground of fraud, it is not essential that the representations or conduct giving rise to its application should be fraudulent in the strictly legal significance of that term, or with intent to mislead or deceive; the test appears to be whether in all the circumstances of the case conscience and duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct; whether the author of a proximate cause may justly repudiate its natural and reasonably anticipated effect; fraud, in the sense of a court of equity, properly including all acts, omissions and concealments which involve a breach of legal or equitable duty, trust or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another.
If, in these circumstances, the telephone conversation of February 9th or 10th was, as narrated by Dr. Howard, to the effect that Dr. Howard was to submit the offer of Mr. Turnbull to his wife and subsequently apprise Mr. Turnbull of his determination  Mr. Turnbull admittedly knowing that the statutory bar would arise February 11th, and either knowing or having what appears to have been good reason to believe that Dr. Howard was probably ignorant of that *306 fact  it seems impossible to escape the conclusion that in the circumstances Mr. Turnbull owed to Dr. Howard a duty in connection with that offer to apprise him of the fact that the offer could only be considered open at most two days because of the existence of the statute, since a reply from Dr. Howard within the two days could not have been reasonably anticipated by Mr. Turnbull without some suggestion of that nature; the natural and reasonably anticipated effect of such an offer at that late time, without the suggestion of limitation of time for the proposed reply, was to cause Dr. Howard to subject his claim to the bar of the statute.
But even assuming the telephone conversation to have been as narrated by Mr. Turnbull, I am impressed that in the circumstances already narrated it was unreasonable, unjust, unfair and unconscientious for Mr. Turnbull to delay his promised report from the preceding October until at most two days before the expiration of the statutory period, knowing that Dr. Howard had been awaiting a reply from him during all that time, and then precipitously declare his offer an ultimatum, without at least apprising Dr. Howard of the fact, then admittedly in Mr. Turnbull's mind, that only two days remained for suit. The effect of his conduct was to subject complainants' claim to the bar of the statute, and that effect, in the circumstances stated, appears to have been the natural and probable effect reasonably within the contemplation of Mr. Turnbull.
While it cannot be said to be ordinarily any part of duty to apprise an adversary of his rights, it must be recognized that one cannot justly or equitably lull his adversary into a false sense of security and thereby cause his adversary to subject his claim to the bar of the statute and then be permitted to plead the very delay caused by his course of conduct as a defense to the action when brought. [102 N.J. Eq. at 521-523; citations omitted]
We ought not allow the "sporting contest" view of the adversary process to reward practices designed to mislead members of the public into withholding legal action until it is too late to do so. Cf. N.J.S.A. 56:8-2, which provides that the use of any "deception" or the "concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission" in connection with the sale of any merchandise is an "unlawful practice." I would apply a similar standard in judging the conduct of an insurance adjuster for the purpose of determining an equitable bar to the plea of the statute of limitations. See Tevis v. Tevis, 79 N.J. 422, 433 (1979), where the court found no reliance upon "any misleading or deceitful misrepresentation."
The evidence in Friedman v. Friendly Ice Cream Co., 133 N.J. Super. 333 (App.Div. 1975), may have presented a stronger case than the case at hand. But the Friedman case does not *307 establish the only basis for equitable estoppel. Although to some extent I differ with the trial court's evaluation of the evidence in this case, I base my conclusion on what I perceive to be essentially uncontroverted evidence, accepting the trial judge's finding on the one serious factual dispute as to whether Lang ever promised the Tantums a settlement. In my view such a promise would strengthen plaintiff's case, but it is not a sine qua non to equitable relief.
Accordingly, I would reverse the judgment below and reinstate plaintiff's claim.
NOTES
[1] In his signed statement plaintiff described the accident as follows:

On March 31, 1975 Charles Binz had dinner at my house and afterwards we were going back to his apartment so he could get a change of clothes and then we were going out. This is when the accident occurred when we were going to Charles' apartment. We were traveling towards Route 526 on Yellow Meeting House Road, Charles was driving, and I was sitting in the front passenger seat. When I got into the car I pulled the door shut and assumed it had latched properly; I've ridden in his car a number of times and never had a problem with this door. Charley slowed down as we approached the curve in the road, I'd say he was going approximately 25 m.p.h. as we entered the curve. Also, there are no seat belts in his car. It all happened so fast, he no sooner entered the curve and my door flew open; I tried to grab onto the seat to hold myself from falling out of the car but the force was too much. I fell out of the car and onto the road, point of impact was the road and my right hip, I hit the road and came to rest right where I hit, I did not roll over. Charley pulled the car over and then backed the car up to me and he helped me get into the car, I could not walk without help. We drove back to my parents house and my mother called the Allentown First Aid Squad.
In his signed statement defendant described the accident as follows:
The weather at the time was clear, roads were dry, visibility was good. It was just getting dark at this time. In my car besides me driving was one passenger sitting in the front passenger seat, his name is Wilfred Tantum, Jr. of R.D. # 2, Cream Ridge, New Jersey. We had just finished having dinner at his parents house, where he lives; he is separated from his wife but not divorced yet. We left his parents house and were driving over to my apartment when the accident occurred. Yellow Meeting House Road is a two lane country road, very narrow. I was heading towards Route 526 when I approached a curve in the road, the road curved to the left. I slowed down to approximately 20 m.p.h. as I entered the curve; I had no sooner entered the curve when the passenger door flew open and my passenger fell out of the car and onto the roadway. As soon as this happened I pulled the car over to the side and got out to go see if he was injured.
[1] Lang testified that in response to Mrs. Tantum's requests for "advance payments" he replied that there were "no advance payments to be made," that "we did not admit liability," that "I never actually mentioned settlement with her," and that, "Oh, yes, I always asked her for medical information." (Emphasis supplied.)